530 So.2d 1151 (1988)
Tammy Dupre PITRE, et al.
v.
OPELOUSAS GENERAL HOSPITAL, et al.
No. 87-C-2360.
Supreme Court of Louisiana.
September 12, 1988.
*1152 Victor Marcello, Donalsonville, for applicant.
Debra Templet, Watson, Blanche, Wilson & Posner, Baton Rouge, Marc Judice, Juneau, Hill, Judice & Adley, P.L.C., Lafayette, Alex Andrus, Andrus & Doherty, Opelousas, for respondent.
John S. Baker, Jr., amicus curiae for Dr. John Kempf.
*1153 Basile J. Uddo, New Orleans, amicus curiae for Louisiana Right to Life Federation, Louisiana Pro-Life Counsel, Baton Rouge Right to Life, Eunice Right to Life, Heartbeat of Louisiana, Inc., New Orleans Right to Life.
W.J. Manion, amicus curiae for Tammy Dupre Pitre, et al.
DENNIS, Justice.
This medical malpractice suit filed by parents of an albino child, seeking damages for themselves and the child, arises out of a surgeon's alleged negligence which caused the failure of a bilateral tubal ligation to sterilize the mother, resulting in the unplanned and unwanted birth of the child. We granted a writ to review the pretrial ruling by the court of appeal under its supervisory jurisdiction dismissing the child's suit for failure to state a cause of action and striking all of the parents' individual claims except for expenses associated with pregnancy and delivery and for the husband's loss of consortium. The primary questions presented for our consideration are (1) whether the physician owed a duty to the parents to exercise reasonable care in performing the operation or to advise the parents that the operation had failed, and, if so, what are the kinds and the extent of damages for which the physician may be held accountable; (2) whether the physician owed a duty to the unconceived child to avoid acts or omissions foreseeably likely to cause the child to be born with a congenital defect, and if so, whether under the facts alleged in this case the physician's duty encompassed the risk that the child would be born with albinism.

Facts and Procedural History
Tammy Pitre underwent a bilateral tubal ligation on April 25, 1984 at Opelousas General Hospital. The surgery was performed by Dr. John Kempf in conjunction with the delivery of the Pitres' second child. A pathology report dated April 30, 1984 indicated that Dr. Kempf severed fibre muscular vascular tissue rather than fallopian tissue during the surgical procedure. The petitioners Tammy & Dwain Pitre were not informed of this finding. Mrs. Pitre later became pregnant and gave birth to their third child, Hannah. Hannah was born with the congenital defect known as albinism.
The Pitres filed suit naming Opelousas General Hospital and Dr. John Kempf as defendants. The petition alleges that as a result of the failure of Dr. Kempf to properly perform the bilateral tubal ligation and the failure of either Opelousas General Hospital or Dr. Kempf to inform Tammy Pitre that the operation had been unsuccessful, she became pregnant. Petitioners also allege that Hannah Pitre was born with a physical deformity, albinism, which will require medical attention for the rest of her natural life, that she has severe problems with visual acuity, cannot see in bright light and will have permanent visual problems.
The claim of the parents includes damages for expenses incurred as a result of the pregnancy and delivery or birth as well as a general demand for emotional and mental distress, past, present and future. They ask for costs of rearing the child, special expenses for the child's deformity, expenses for the change in family status including extra money to compensate for the fact that their society, comfort, care, protection and support must be spread over a larger group, and money to replenish the "family exchequer" so that Hannah's needs will not deprive other members of the family. Additionally, Tammy Pitre seeks damages for her physical pain and suffering and Dwain Pitre seeks damages for loss of consortium, service and society.
On behalf of their minor child, Tammy & Dwain Pitre seek damages for the "wrongful life" of Hannah Pitre in that she was born with a physical deformity, namely albinism, future medical expenses, past, present, and future, emotional and mental hardship, pain and suffering.
The trial court overruled the various motions and exceptions filed by the three defendants including exceptions of no cause of action, motions for summary judgment and a motion to strike those portions of the petition concerning the "wrongful life" action and certain damages alleged by Tammy *1154 and Dwain Pitre individually. The court of appeal granted Dr. Kempf's pretrial writ application to consider the validity of the asserted causes of action. Although Dr. Kempf was the only party to apply for writs, the court of appeal ordered a stay of all further proceedings in this case.
After considering written and oral arguments, the court of appeal sustained the exception of no cause of action as to the "wrongful life" claim of Hannan Pitre. The court of appeal found it would be improper to grant Dr. Kempf's exception of no cause of action regarding the parents' claim. However, by granting a motion to strike, the court of appeal limited the elements of damages possibly recoverable by Tammy Pitre to expenses incurred during pregnancy and delivery and limited those of Dwain Pitre to loss of consortium, service, and society and expenses incurred during pregnancy, delivery, and post delivery. Pitre v. Opelousas General Hospital, 517 So.2d 1019 (La.App. 3 Cir.1987). This court granted a writ to review the court of appeal decision. Pitre v. Opelousas General Hospital, 519 So.2d 105 (La. 1987).

Similar Tort Claims in Other States
Recent decades have produced a variety of tort claims arising when a member of the medical profession's negligence results in the birth of an unwanted child. W. Keeton, D. Dobbs, R. Keeton, and D. Owen, Prosser and Keeton on the Law of Torts, § 55 (5th ed. 1984)(hereinafter cited as Prosser and Keeton). The various causes of actions have been defined and distinguished to help clarify precisely what issues are involved in the case. See Garrison v. Foy, 486 N.E.2d 5 (Ind.App.3d Dist 1985); 15 Loy.U.Chi.L.J. 799 (1983-84).
In wrongful birth actions, parents claim they would have avoided conception or terminated the pregnancy if they had been informed of the risk of birth defects to the child. Whereas a wrongful birth action is brought by the parents, a wrongful life action is brought by or on behalf of the child for having to endure life in the afflicted condition. There is no allegation that the physician's negligence directly caused the defect. Rather, it is alleged that the physician's negligent practice or failure to properly advise the parents has led to the birth of the child in the afflicted condition. Garrison v. Foy, 486 N.E.2d 5. A wrongful pregnancy or wrongful conception action involves a suit brought by the parents of a child, usually born healthy. The parents allege that the negligent performance of a sterilization technique caused the conception of the unplanned child. Id.
A study of other jurisdictions reveals a myriad of answers to the problem. The recognition or denial of particular causes of actions, and the respective reasons offered by various courts, may promote a clearer understanding of the issues. In 1967, New Jersey handed down the landmark decision of Gleitman v. Cosgrove, 49 N.J. 22, 227 A.2d 689 (1967). The mother claimed the doctor had negligently assured her that the disease contracted during her pregnancy would not affect the child. Moreover, the mother claimed that if she had been adequately informed she may have procurred an abortion. The court denied recovery finding it impossible to measure the difference between life with defects against nonlife. In addition, there were the practical difficulties of calculating damages and the fear by the court that allowing such an action would be tantamount to sanctioning abortion. Both the wrongful life and the wrongful birth actions were denied by the court. Prosser and Keeton, supra, § 55.
The years following Gleitman witnessed the legalization of abortion, Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and many jurisdictions became receptive to parents' wrongful birth claims. Robak v. United States, 658 F.2d 471 (7th Cir.1981); Becker v. Schwartz, 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978). On the other hand, all jurisdictions that have confronted the issue have denied the child's wrongful life cause of action for general damages for the suffering of being *1155 born in an afflicted condition.[1] Finally, a great majority of courts allow recovery to the parents for their wrongful conception or wrongful pregnancy claims. See Custodio v. Bauer, 251 Cal.App.2d 303, 59 Cal. Rptr. 463 (1967); Sherlock v. Stillwater Clinic, 260 N.W.2d 169 (Minn.1977); Ochs v. Borrelli, 187 Conn. 253, 445 A.2d 883 (1982). However, the courts disagree on the amount of damages that should be recoverable. Of the courts recognizing the cause of action, most allow expenses directly associated with the pregnancy and delivery. Mason v. Western Pennsylvania Hospital, 499 Pa. 484, 453 A.2d 974 (1982); Beardsley v. Wierdsma, 650 P.2d 288 (Wyo.1982); Wilbur v. Kerr, 275 Ark. 239, 628 S.W.2d 568 (1982). Although some award child-rearing expenses, this figure is usually reduced by the "benefit" the parents receive by being blessed with this child. Prosser and Keeton, supra, at § 55; Second Restatement of Torts, § 920.

Elements of Delictual Responsibility
Under one analytical approach, in order for a defendant to be held liable for damages caused another by his negligence, affirmative answers must be given to these questions: (1) given the relationship and circumstances of the parties, does the law impose upon the defendant a duty of reasonable conduct for the benefit of the plaintiff, the violation of which is considered to be fault? (2) If the defendant owed such a duty, did his conduct fall short of the standard and come within the scope set by law? (3) Did the defendant's negligence in fact cause damage to the plaintiff (`cause in fact')? (4) Should any of the damage to the plaintiff be ascribed in law to the defendant, and, if so, should the defendant be held liable for every kind of damage done to each of plaintiff's interests (`legal cause')? La.Civ.Code Ann. art. 2315 (West Supp. 1988) and 2316 (West 1979); see 12 F. Stone, Louisiana Civil Law Treatise Tort Doctrine § 10 (1977); see R.W.M. Dias and B.S. Markesinis, Tort Law p.36 (1984); Prosser and Keeton, supra, § 30.
For the purpose of determining the validity of the defendant's motion and exception, all well pleaded allegations of fact are accepted as true. La. Code Civ.Proc.Ann. art. 931 (West 1984); Haskins v. Clary, 346 So.2d 193 (La.1977); Hero Lands Co. v. Texaco, Inc., 310 So.2d 93 (La. 1975); La. State Bd. of Med. Exm'r's. v. England, 252 La. 1000, 215 So.2d 640 (1968). Accordingly, we accept as true the plaintiff's allegations that defendant was guilty of negligence that in fact caused the damages. Thus, the only issues present for our consideration are whether defendant owed a duty of reasonable care to the plaintiffs and whether his negligence was a legal cause of the damage done to each of the plaintiffs' interests that was injured.
The legal cause of the damage in question could be stated as part of the duty inquiry: was the defendant under a duty to protect each of the plaintiff's interests affected against the type of damage that did in fact occur? Such a form of statement is sometimes helpful because it is less likely than "proximate cause" to be interpreted as if it were policy free fact finding; thus, "duty" is more apt to direct attention to the policy issues which determine the extent of the original obligation and its continuance, rather than to the mechanical sequence of events which goes to make up causation in fact. See, e.g., PPG Industries, Inc. v. Bean Dredging, 447 So.2d 1058 (La.1984); Carter v. City Parish Governments of East Baton Rouge, 423 So.2d 1080 (La.1982); Hill v. Lundin and Assoc., Inc., 260 La. 542, 256 So.2d 620 (1972). The duty risk approach is most helpful, however, in cases where the only issue is in reality whether the defendant stands in any relationship to the plaintiff as to create any legally recognized obligation of conduct for the plaintiff's benefit. Prosser and Keeton, supra, § 42. Terms such as "duty" are merely verbal expressions of *1156 policy decisions and do not explain them. Allusions to policy should not be made a substitute for more determinate legal principles when they may be utilized. It is the task of the bench and the bar not only to ensure that justice is done, but also to demonstrate that it is being done according to law, which is essential to preserving public confidence. Policy considerations do indeed shape one's sense of the right decision, but whenever possible these should be given effect through the indispensable minimum of principles of liability in negligence, nebulous though they may be in themselves. Dias and Markesinis, supra, at 39. Accordingly, we conclude that, when the case presents difficult issues as to the nature and extent of damages ascribed to the defendant, once it has been decided that the defendant's breach of a duty in fact caused damage to the plaintiff, it may be helpful to use a "legal cause" analysis which affords the application of "foreseeability" rules and other concepts of limitation. Although indistinct, these rules and concepts are more determinate than the abstract idea of a "duty" based on various "policy considerations" and may prove more helpful to triers of the facts, at least as starting points for legal reasoning.

Duty of CareIn General
In Louisiana, "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La.Civ.Code Ann. art. 2315 (West Supp.1988). This fundamental principle tells us that he who causes a damage to another, by his fault, is obliged to repair it, but does not tell us, and can not tell us, when the author of the damage is at fault. When they spoke of "any act", the authors of the Code had in mind the repression of the innumerable acts which constituted faults under whatever form they appeared. The framers conceived of fault as a breach of a preexisting obligation, for which the law orders reparation, when it causes damage to another, and they left it to the court to determine in each case the existence of an anterior obligation which would make an act constitute fault. 2 M. Planiol, Treatise on the Civil Law, Part 1 §§ 863-865 (1959).
A physician has special legal obligations in connection with his profession. As any person, he "is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill." La.Civ.Code Ann. art. 2316 (West 1979). Additionally, a general practitioner is obliged to possess the degree of knowledge or skill possessed, and to exercise the degree of care ordinarily exercised, by physicians actually practicing in a similar community under similar circumstances; a physician practicing in a specialty is required to exercise the degree of care ordinarily practiced by doctors in that specialty. La.Rev.Stat. 9:2794(A)(1) (West Supp.1988). The violation of these obligations constitutes a fault which must be evaluated, taking into account the professional practices and customs by comparing the conduct of the author of the damage with the normal and regular activity of a person exercising the same profession. 2 M. Planiol, Treatise on the Civil Law, part 1 § 865A (1959).

Duty of CareParents' Claim
Plaintiffs allege that the defendant physician negligently performed a bilateral tubal ligation on Tammy Pitre and failed to inform her that the operation had been improperly performed. Consequently, they contend, she became pregnant and gave birth to a child with a birth defect. Clearly, under the circumstances, the doctor owed a duty to the Pitres to exercise the degree of care ordinarily exercised by surgeons performing such operations in that specialty. Moreover, if he was aware of the failure of the operation, he owed them the duty to inform them that the object of sterilization had not been attained. Virtually all of the important policy considerations affecting tort liability demand recognition of such a duty: e.g., the moral aspect of defendant's conduct, the need for compensation, the need for incentive to prevent future harm, the relative ability of each class of litigants to bear or distribute losses. See e.g., PPG Industries, Inc. v. Bean Dredging, 447 So.2d 1058 (La.1984); Bell v. Jet Wheel Blast, 462 So.2d 166 *1157 (La.1985); Halphen v. Johns-Mansville Sales Corp., 484 So.2d 110 (La.1986); Prosser & Keeton, supra at § 4. Furthermore, there is now quite general agreement that a doctor who negligently fails directly to prevent the conception or birth of an unwanted child, as by negligently performing a sterilization or abortion procedure, or by failing to diagnose or inform the parents that the child might be born with a birth defectbecause of a disease or genetic conditionbreaches his duty of care owed to the parents. See Prosser and Keeton, supra, § 55; Robak v. United States, 658 F.2d 471 (7th Cir.1981); Becker v. Schwartz, 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978); Harbeson v. Parke-Davis, Inc., 98 Wash.2d 460, 656 P.2d 483 (1983); Naccash v. Burger, 223 Va. 406, 290 S.E.2d 825 (1982); Speck v. Finegold, 497 Pa. 77, 439 A.2d 110 (1981); Eisbrenner v. Stanley, 106 Mich.App. 357, 308 N.W.2d 209 (1981).

Duty of CareChild's Claim
The plaintiffs allege that the defendant's negligent surgery and failure to warn the parents caused the child to be born with albinism. Apparently they do not contend that the malpractice directly caused the birth defect, but their petition implies that the doctor's carelessness caused the child's birth and thereby made it possible for the congenital defect to occur.
Although we conclude provisionally that under the facts alleged in the petition the doctor did not owe a duty to protect the child from the risk of albinism, we reject defendant's arguments calling for a categorical denial of any duty on the part of a physician to protect an unconceived child from being born with a birth defect. When a physician knows or should know of the existence of an unreasonable risk that a child will be born with a birth defect, he owes a duty to the unconceived child as well as to its parents to exercise reasonable care in warning the potential parents and in assisting them to avoid the conception of the deformed child. The time has come when we can and should say that each person owes a duty to take reasonable care to avoid acts or omissions which he can reasonably foresee would be likely to injure a present or future member of society unless there is some justification or valid explanation for its exclusion. Although there may be good reason in a particular case to limit liabiity for breach of this duty under concepts of legal cause, everything in the Code, the statutes and the underlying policy considerations encourages the recognition of such a duty as a prima facie obligation.
The persons at whose disposal society has placed the potent implements of technology owe a heavy moral obligation to use them carefully and to avoid foreseeable harm to present or future generations. In the field of medicine, as in that of manufacturing, the need for compensation of innocent victims of defective products and negligently delivered services is a powerful factor influencing tort law. Typically in these areas also the defendants' capacity to bear and distribute the losses is far superior to that of consumers. Additionally these defendants are in a much better position than the victims to analyze the risks involved in the defendants' activities and to either take precautions to avoid them or to insure against them. Consequently, a much stronger and more effective incentive to prevent the occurrence of future harm will be created by placing the burden of foreseeable losses on the defendants than upon the disorganized, uninformed victims.
Logic and sound policy require a recognition of a legal duty to a child not yet conceived but foreseeably harmed by the negligent delivery of health care services to the child's parents. Although this view has not yet been widely adopted, several courts have held that it is not necessary that the legal duty be owed to one in existence at the time of the wrongful act. Bergstreser v. Mitchell, 577 F.2d 22 (8th Cir.1978); Renslow v. Mennonite Hospital, 67 Ill.2d 348, 10 Ill.Dec. 484, 367 N.E.2d 1250 (1977); Jorgensen v. Meade Johnson Laboratories, Inc., 483 F.2d 237 (10th Cir. 1973). Contra, Albala v. City of New York, 54 N.Y.2d 269, 429 N.E.2d 786, 445 N.Y.S.2d 108 (1981). "[A] thinly reasoned *1158 case...." Prosser and Keeton, supra, at § 55.
Actually these cases do not present a significant extension of the principles of liability for prenatal injuries. See Robertson, Toward Rational Boundaries of Tort Liability for Injury to the Unborn: Prenatal Injuries, Preconception Injuries and Wrongful Life, 1978 Duke L.J. 1401, 1438 (1978). Moreover, as the Renslow court noted, it has long been recognized that a duty may exist to one foreseeably harmed though he be unknown and remote in time and place. Renslow v. Mennonite Hospital, 10 Ill.Dec. at 488-489, 367 N.E.2d at 1254-1255.[2]
That the duty of care, the breach of which will create liability, should not depend on the physical existence of the individual plaintiff at the moment of the defendant's wrongful act is most aptly illustrated by the frequently used hypothetical examples of defective baby food manufactured before the child who consumed it was born, and of the dangerous apparatus installed in the home before the child injured by it was born. Prosser & Keeton, supra, § 55 n. 4; Robertson, supra, 1978 Duke L.J. at 1438. If recovery depended on the baby being alive at the time of manufacture, then such a child would be without a remedy. A wrong without a remedy could easily occur in any products liability case involving a young child victim. See, e.g., Toups v. Sears, Roebuck and Co., 507 So. 2d 809 (La.1987); Brown v. Sears, Roebuck and Co., 514 So.2d 439 (La.1987) cf. Winterrowd v. Travelers Indemnity Co., 462 So.2d 639 (La.1985) (Accident occurred 69 years after manufacture of the machine.).
Nevertheless, we conclude that in the present case the physician did not owe a duty to the unconceived child to protect her from the risk of being born with albinism. Our brief study of some of the literature on this congenital disorder indicates that it cannot be easily predicted or foreseen by a treating physician. See M. Strickberger, Genetics pp. 119-122 (2d ed. 1976). The plaintiffs' petition does not contain any allegation that the defendant physician knew or should have known of the risk of this abnormality. The policy considerations affecting tort law do not impel the recognition of a duty when the doctor had no reason to suspect that the danger existed and did not have reasonable means of detecting its potentiality. In the event that our appreciation of the nature of the birth defect or of the precautions available to the medical profession is in error, however, the child's petition shall be dismissed provisionally only, with leave to amend the petition within thirty days of the finality of this decision.

Legal CauseIn General
We have concluded that the law recognizes a duty by a physician in this kind of situation to potential parents to take reasonable care to avoid acts or omissions which he can reasonably foresee would be likely to lead to the birth of a child. According to the pleadings, which must be accepted as true for purposes of the exception and motion, the doctor violated his duty of care and thereby in fact caused damage to the parents. Consequently, we are concerned here with whether the doctor's negligence was a legal cause of the parents' damage and, if so, the kind and the extent of damage to be attributed to the physician.
Because the civil code does not define legal causation any better than it defines fault or damage, our courts have had to fill in the content of this notion. In doing so, this court has relied heavily on the works of Professors Green and Malone in developing a duty risk approach that incorporates *1159 the consideration of policy factors involved in a legal cause analysis elsewhere. See, e.g., Robertson, Dialogues on Hill v. Lundin, 34 La.L.Rev. 1 (1973). While this single case could be decided adequately on duty alone, we feel that more is called for here because of the complexity of the issues and the newly emerging legal duties involved. Rather than merely deciding that the defendant's duty does or does not cover certain types of damage after reflecting on appropriate policy considerations, we will not only engage fully in that judicial process but we will also attempt to articulate auxiliary rules for determining the extent and nature of damages ascribable to the defendant that will be helpful to triers of fact in future cases. These rules should be considered as general principles that can and should be expanded or contracted according to the relevance of certain policy considerations in a particular case. Furthermore, in formulating and applying these auxiliary rules or principles it may be helpful to compare some of the legal cause concepts that have developed in both the civil and the common law.

Legal CauseCivil Law
Several restrictive theories have evolved in the civil law which tend to impose limits on causation for legal purposes. The theory of adequate cause was formulated by the German Von Kries at the end of the nineteenth century. P. Catala and J. Weir, Delict and Torts: A Study in Parallel, Part IV, Causation, 39 Tul.L.Rev. 701, 717 (1965); 12 F. Stone, Louisiana Civil Law Treatise Tort Doctrine § 32 (1977); A.T. von Mehren, The Civil Law System, Cases and Materials for the Comparative Study of Law, Chapter 7 at 359. In practice, adequate cause has been defined as "the fact or event which is normally calculated to produce harm of the kind in question, in a given situation, as distinct from the cause which produces such harm only by reason of extraordinary circumstances." Catala and Weir, supra, at 718.
Although the theory of adequate cause and even that of reasonable foreseeability have had a perceptible influence, modern French law is not committed to any particular restrictive theory. Id. at 732; See generally von Mehren, supra, p. 358. Article 1150 of the French Civil Code limits the damages payable in the case of breach of contract to the amount foreseeable at the time the contract was made. But this article applies only in the law of contract: It has no direct application to delictual responsibility. In regard to delictual responsibility, French law rejects the subjective approach to the notion of reasonable foresight. Catala and Weir, supra, at 732. At present, no kind of "systemization" is possible, but certain observable tendencies do exist. Id. at 735.
The moral factor is important in the appreciation of causation. F.H. Lawson, Negligence in the Civil Law, p. 64 (1962). There is a clear tendency to give greater causal effect to an intentional fault than to a merely negligent fault, and to a negligent fault than to an act or circumstance where the element of fault is altogether absent. Another tendency is that of distinguishing between the consequences of a harmful act that are immediate in time, and the more remote consequences of the same act. A still further, and doubtless clearer, trend consists in distinguishing between physical harms and other forms of damage, which may be described as economic harms. Compensation for the immediate physical consequences of a harmful act extends well beyond the limits suggested by the criterion of reasonable foresight. Catala and Weir, supra, at 739.
Thus, legal causation is influenced by the other two elements of civil responsibility, fault and damage. The moral element in the harmful act weighs very heavily on the thinking of the court in determining the question of causation. The court is necessarily less exigent in requiring proof of causation where great fault has been established. 12 F.Stone, Louisiana Civil Law Treatise Tort Doctrine, § 43, (1977); Comment, Proximate Cause in Louisiana, 16 La.L.Rev. 391, 401-404 (1956). The influence of damage on the causation problem is less obvious but no less probable: According to the particular facts of each case, the court takes into account the nature of the interest affected (physical, material or moral), *1160 that is to say the nature of the damage. Being only human, there is no doubt that the judges pay more or less attention, as the case may be, to the need for compensation. Catala and Weir, supra, at 739-740.

Legal CauseCommon Law Approaches
Even where the defendant's conduct has in fact been one of the causes of the plaintiff's injury, the question of legal cause remains, i.e., where the policy of the law will extend responsibility for the conduct to the consequences which have in fact occurred. Prosser and Keeton, supra, § 42. It would not be possible or useful for us to examine in detail the countless variations of legal or proximate cause theory. But it may be helpful to restate some of the recognized generalizations about this area of legal doctrine.
There are two contrasting theories of legal cause which recur throughout the cases and account for most of the conflict with respect to the choice of a basic theory: (a) The foreseeable risk theorythe scope of liability should ordinarily extend to but not beyond the scope of the "foreseeable risks"that is, the risks by reason of which the actor's conduct is held to be negligent. (b) The direct consequences theorythe scope of liability should ordinarily extend to but not beyond all "direct" (or "directly traceable") consequences and those indirect consequences that are foreseeable. Id.
Results are reached in certain types of fact situations that are more accurately characterized as exceptions to these basic rules, but often these outcomes are explained as if they were routine applications of the basic rule. This outcome is accomplished by expansive or narrow application of such flexible concepts as "foreseeable" and "direct." Id. For example, some courts have thrown over the language of foreseeability, and have said outright that it becomes a matter of hindsight, by relating the consequences backward to the original negligence after they have occurred. Id. at § 43, n. 45. The Restatement of Torts has in a limited way adopted this approach by saying that the defendant is not to be liable for consequences which, looking backward after the event with full knowledge of all that has occurred, would appear to be "highly extraordinary". Id.; Second Restatement of Torts, § 435(2).
In English law many tests are used for determining whether damage is to be legally attributable to the defendant, but the one which predominates in the terminology of the courts is foreseeability of damage. The test, be it noted, is foreseeability in the sense of hindsight, not foresight; it is what a court, reviewing an event later, considers to have been foreseeable in order to do justice in the case before it. Dias and Markesinis, supra, at 37.
A minority view holds that a defendant who is negligent must take existing circumstances as they are, and may be liable for consequences brought about by the defendant's acts, even though they were not reasonably to be anticipated. Prosser and Keeton, supra, at § 43. This view becomes a majority position by almost universal agreement, however, when unforeseeable harm to a plaintiff follows an impact upon his person. For example, the defendant is held liable when his negligence operates on a concealed physical condition, such as pregnancy, or a latent disease, or susceptibility to disease, to produce consequences which the defendant could not reasonably anticipate. Id.
According to Prosser and Keeton, the "scope of the foreseeable risk" is on its way to ultimate victory as the criterion of what is legal cause, but the triumph has been both more easily achieved and less clearly significant because the concept of foreseeability so completely lacks all clarity and precision; it amounts to little more than a convenient formula for disposing of the caseusually leaving it to the jury under instructions calling for "foreseeable", or "natural and probable" consequences. Id.

Legal CauseUnderlying Policy Considerations
What are the underlying policy considerations that have caused both civilian and common law courts to expand or contract the concepts of "foreseeability" in particular cases and to grope from time to time *1161 for some more precise methods of limiting liability? Inspired by both Geny and Cardoza, this court has identified the policy sources informing the conception of the duty in a tort case to be those moral, social and economic considerations that a conscientious, objective policy maker would advert to in formulating a rule to govern the case. See Entrevia v. Hood, 427 So.2d 1146 (La.1983); Bell v. Jet Wheel Blast, 462 So.2d 166 (La.1985). Common law scholars have singled out for special mention various factors affecting tort liability: the need for compensation of losses; the historical development of precedents; the moral aspects of the defendant's conduct; the efficient administration of the law; the deterrance of future harmful conduct; the capacity to bear or distribute losses. Prosser & Keeton, supra, § 4; see G. Calabresi, Cost of Accidents, pp. 24-33 (Yale University (1970)).

Legal CauseLouisiana Civil Code
Although the articles in the Code on damages under Title IV on conventional obligations or contracts are primarily intended to govern contractual liability, La. Civ.Code Ann. art. 1994, comment (b) (West 1987), our objective search for rules to govern a tort case may involve looking for an analogy among codal rules, principles, concepts or statutory doctrines. See Geny, Methode d'Interpretation Et Sources In Droit Prive' Positif §§ 155, 156 (Trans.La. State Law Inst.1954); Bell v. Jet Wheel Blast, 462 So.2d 166 (La.1985) and other authorities cited, 462 So.2d at 170. Under these articles, damages are measured by the loss sustained by the obligee and the profit of which he has been deprived. La. Civ.Code Ann. art. 1995 (West 1987). An obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made. La.Civ.Code Ann. art. 1996 (West 1987). An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform. La.Civ.Code Ann. art. 1997 (West 1987). An obligor is in bad faith if he intentionally or maliciously fails to perform his obligation. Id. at comment(b). When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages. La.Civ. Code Ann. art. 1999 (West 1987).

Formulation and Application of Precepts
After considering the foregoing rules and policy considerations, we conclude that as a general principle that the same criterion of foreseeability and risk of harm which determined whether a physician in this kind of situation was negligent in the first instance should determine the extent of his liability for that negligence; and that the doctor should not be held liable for consequences which no reasonable practitioner would expect to follow from the conduct. In accordance with the almost universal rule, however, the physician shall be liable for all resulting harm to the person caused by a negligent physical impact upon the person of the plaintiff. Likewise, in accordance with the general rule, and by analogy to our civil code articles governing contractual damages, a physician who intentionally, recklessly or in bad faith violates his legal duty shall be liable for all damages, foreseeable or not, that are a direct consequence of his breach of obligation.
We reject as a general rule the test of foreseeability in the sense of hindsight, not foresight, as being inappropriate when the doctor has been guilty only of ordinary negligence in this kind of medical malpractice case. If the trier of fact is required to attribute the knowledge of hindsight to the practitioner, the doctor may be held unfairly to a standard of knowledge or information impossible in daily practice and attainable only by the research scientist or the analytical pathologist looking backward reflectively at the particular case. "[T]o one gifted with ominisence as to all existing circumstances, no result could appear remarkable, or indeed anything but inevitable, as a matter of hindsight." Prosser & Keeton, supra, § 43.
Applying these precepts to the facts alleged in the petition, we conclude that the parents upon proper proof may recover for the expenses incurred during pregnancy and delivery, the mother's pain *1162 and suffering, the father's loss of consortium, service and society, and their emotional and mental distress associated with the birth of an unplanned and unwanted child and the unexpected restriction upon their freedom to plan their family. These damages were foreseeable consequences of the doctor's alleged negligent acts and omissions.
The parents may not recover for the special expenses regarding the child's deformity, or for emotional and mental distress associated with the child's deformity. These are not consequences which were caused by an impact on the person of the mother or which a reasonable practitioner would expect to follow from the conduct as alleged in the petition. Based on our present knowledge of the congenital disorder of albinism and methods of predicting its occurrence we cannot infer that the doctor reasonably could have foreseen an unreasonable risk of a birth defect in this case. As in the child's action, however, the parents will be permitted to amend their petition in good faith to remove this deficiency.
The plaintiffs cannot recover for the economic costs of rearing an unplanned and unwanted child, expenses of the change in family status, including extra money to compensate for the fact that the mother must spread her society, comfort, care, protection and support over a larger group, money to replenish the "family exchequer" so that the child will not deprive the other family members. These are the ordinary vicissitudes that befall any family with the birth of a healthy, normal child. Absent unusual circumstances, a child is presumed to be a blessing not offset by the inconvenience of redistributing the family income and patrimony which he or she may occasion. Unfortunately, the child in this case may represent a greater burden than a healthy offspring but that is a result of her albinism which we have determined is not a legal consequence of the conduct alleged. Therefore, proof of the ordinary economic impact of an additional child would not constitute proof of a loss to the parents or the family.

Procedural Issues
The defendant's exception of no cause of action to the child's claim was correctly sustained by the court of appeal. In the interests of justice, however, the plaintiffs will be granted thirty days from the finality of this decision within which to amend the petition, if they can, to remove the grounds of the objection noted in this opinion.
When a petition states a cause of action as to any ground or portion of the demand, the exception of no cause of action must be overruled. The trial court should exclude evidence at trial pertaining to those elements of damages which, under this opinion, are not recoverable based on the present allegations of facts. Rodriguez v. American Bankers Ins. Co. of Fla., 386 So.2d 652 (La.1980). The court of appeal correctly applied this rule in overruling the defendant's exception of no cause of action as to the parents' claim. In the interests of justice, the plaintiffs will be granted thirty days from the finality of this decision to amend their petition to remove the grounds of the objection.
The court of appeal erred in granting the defendant's motion to strike and in striking portions of plaintiff's petition. A motion to strike is not an authorized or proper way to procure the dismissal of a complaint or a cause of action. La.Code Civ.Proc.Ann. art. 964 (West 1984); Adams v. N.O. Blood Bank, 343 So.2d 363 (La.App. 4th Cir.1977); see cases interpreting source provision, Fed.Rule Civ.Procedure 12(f): Drewett v. Aetna Cas. & Sur. Co., 405 F.Supp. 877 (W.D.La.1975); Egan v. Pan American Airways, Inc., 62 F.R.D. 710 (S.D.Fla. 1974); Nuccio v. General Host Corp., 53 F.R.D. 234 (E.D.La.1971). Moreover, the granting of a motion to strike rests in the sound discretion of the trial court. La. Code Civ.Proc.Ann. art. 964 (West 1984); see Fed. Rule Civ.Proc. 12(f). The trial court refused to grant the motion in this case. There being no showing or indication in the record of an abuse of discretion, the trial court's decision should be affirmed.

*1163 Decree
The court of appeal's judgment granting the motion to strike is reversed. The court of appeal's judgment sustaining the exception as to the child's claim and overruling the exception as to the parents' claims is affirmed, except that the plaintiffs are granted leave and time to amend the petition to remove the objections. The case is remanded to the trial court for these purposes and for further proceedings.
REVERSED IN PART; AFFIRMED IN PART; AMENDED AND REMANDED TO TRIAL COURT.
CALOGERO and MARCUS, JJ., concur.
NOTES
[1] Several jurisdictions permit the child to recover as special damages the costs of any special training or medical care, but not general damages for his affliction. See Prosser § 55, n. 44; Turpin v. Sortini, 31 Cal.3d 220, 643 P.2d 954, 182 Cal.Rptr. 337 (1982); Harbeson v. Parke Davis, Inc., 98 Wash.2d 460, 656 P.2d 483 (1983); Procanik by Procanik v. Cillo, 97 N.J. 339, 478 A.2d 755 (1984), on remand, 206 N.J.Super. 270, 502 A.2d 94 (1985).
[2] Wintersteen v. National Cooperage & Woodenware Co., 361 Ill. 95, 197 N.E. 578 (1935). See generally Skinner v. Anderson, 38 Ill.2d 455, 231 N.E.2d 588 (1967); Also derivative actions, such as those of a husband or parent for the loss of the wife's or child's services, demonstrate that the law has long recognized that a wrong done to one person may invade the protected rights of one who is intimately related to the first. (See Dini v. Naiditch, 20 Ill.2d 406, 170 N.E.2d 881 (1960)). In these cases, because of the nature of the relationship between the parties harmed, the law recognized a limited area of transferred negligence. Prosser, Palsgraf Revisited, 52 Mich.L.Rev. 1, 20-22 (1953).