830 So.2d 1102 (2002)
Jerrilyn and Jerone CONNER, et al.
v.
Dr. Howard STELLY and Louisiana Patient's Compensation Fund.
No. 02-549.
Court of Appeal of Louisiana, Third Circuit.
October 30, 2002.
Rehearing Denied December 11, 2002.
*1105 M. Keith Prudhomme, Michele S. Caballero, Woodley, Williams, Boudreau, Norman, Brown & Doyle, Lake Charles, LA, Counsel for Defendant/Appellant, The Louisiana Patient's Compensation Fund.
Oliver "Jackson" Schrumpf, Law Offices of Oliver "Jackson" Schrumpf and Charles Schrumpf, Sulphur, LA, Terry Johnson, Lake Charles, LA, Counsel for Plaintiffs/Appellees, Jerrilyn and Jerone Conner, et al.
Court composed of ULYSSES GENE THIBODEAUX, OSWALD A. DECUIR and JIMMIE C. PETERS, Judges.
THIBODEAUX, Judge.
In this medical malpractice case, defendant, Louisiana Patient's Compensation Fund ("PCF"), appeals a judgment pursuant to a jury verdict which awarded Jerrilyn Conner $200,000.00 in pain and suffering, $50,000.00 for loss of enjoyment of life, $12,431.12 for medical expenses incurred during pregnancy and delivery, and $200,000.00 for Ms. Conner's emotional and mental distress, due to a failed tubal ligation, resulting in the birth of premature twin boys who were diagnosed with cerebral palsy. The PCF claims these damages are excessive.
The jury found that future medical expenses on behalf of the twins were not reasonably foreseeable. Ms. Conner answers the PCF's appeal and entreats us to increase the award for loss of enjoyment of life and to award damages for the future medical expenses of the twins.
We affirm.

I.

ISSUES
We shall consider:
(1) whether, under the circumstances of this case, the development of cerebral palsy was within the scope of the duty owed by Dr. Stelly to Ms. Conner or the twins. In other words, was Dr. Stelly's negligence a legal cause of the damages?
(2) whether the awards to Ms. Conner were excessive;
(3) the failure to apportion fault to Ms. Conner;
(4) the failure to exclude the testimony of the plaintiffs' expert witness;
(5) the validity of a "wrongful birth" or "wrongful life" cause of action in Louisiana; and,
(6) the assessment of costs by the trial court.

II.

FACTS AND PROCEDURAL HISTORY
On September 17, 1996, Jerrilyn Conner gave birth to her fourth child, Raven Conner, at Lake Area Medical Center in Lake Charles, Louisiana. Dr. Howard M. Stelly delivered her baby. Upon delivery, Dr. Stelly, at the request of Ms. Conner, performed a post partial bilateral tubal ligation to prevent any further pregnancies. The tubal ligation required cutting both fallopian tubes and simultaneously tying them to prevent further child birth. After reading the pathology report, Dr. Stelly discovered that the lumen, the interior lining of the right tube, was not cut. As a *1106 result, the tubal ligation was incomplete. Dr. Stelly did not inform Ms. Conner of the results of the pathology report. Moreover, Ms. Conner believed that the ligation was a success.
In March of 1997, Ms. Conner discovered, through the use of a home pregnancy test, that she was pregnant. At this time, Conner resided in Fort Bragg, North Carolina, with her husband, Jerone Conner[1], and her four children. (Mr. Conner, a member of the armed forces, was stationed at the local army base). A doctor's examination later confirmed that Ms. Conner was in fact pregnant. Conner was sent directly to Womack Hospital, an Army hospital, where other tests were performed. A vaginal ultrasound indicated that Ms. Conner was pregnant with twins. Upon receiving this information, Conner contacted Dr. Stelly's office to inform him that she was pregnant again. Each time she called she spoke with Dr. Stelly's secretary; however, she never spoke with him directly. Dr. Stelly never returned her phone calls.
Prior to delivery of the twins, Conner, who was unprepared to have any more children, decided to travel to Louisiana to obtain assistance in caring for the twins. Conner was aware that it would be difficult for her to care for six children without any help. Her maternal grandmother was willing to come to North Carolina to help her; however, the Conners would have to transport her there. Conner informed her physician, Dr. Miles E. Wilson, that she would have to travel to Louisiana to bring her grandmother to North Carolina to assist her with the twins. Dr. Wilson told Ms. Conner that if she traveled by ground, she should take 10 to 15 minute breaks every hour to walk around and, rest if necessary, and then resume her travel. Conner followed her doctor's orders.
While in Louisiana, Ms. Conner gave birth to her twin boys. A few days after she arrived in Louisiana, Conner discovered that she was bleeding. A helicopter transported Conner to Willis Knighten Hospital in Shreveport, Louisiana. Conner's twin boys were delivered by Caesarean section at approximately 30 weeks gestation. Both boys were premature. The boys suffered from various health-related illnesses such as respiratory distress syndrome, pneumothoraces, sepsis, jaundice, and many other complications. Upon delivering the twins, Jett and Jordan Conner, Dr. David Lewis, her physician at Willis Knighten, informed Ms. Conner that the first tubal ligation was not properly done. Dr. Lewis performed another tubal ligation after the birth of the twins. Until this time, Ms. Conner believed that she had become pregnant despite the sterilization procedure performed by Dr. Stelly. Dr. Stelly had previously informed Ms. Conner that a tubal ligation did not guarantee that pregnancy was impossible.
The Conner twins remained in the hospital until they were stabilized. Once the twins were released, the Conners went back to North Carolina. Ms. Conner's grandmother did not travel with them, and Conner was primarily responsible for the care of the children.
In North Carolina, Dr. Caroline Maylock, a pediatric physician responsible for the well-baby care of the twins, referred the twins to Educational and Developmental Intervention Services ("EDIS") at Womack Hospital. The Conner twins were referred to this program, though it typically enrolls children who were born under 28 weeks, because there were some concerns about their development. At EDIS, the twins were under the care of *1107 Dr. Sharon Cooper, a pediatrician and fellowship-trained developmental pediatrician. Dr. Cooper attributed the children's illnesses, which developed after their birth, to their prematurity. After conducting a battery of tests, Dr. Cooper found that both twins' motor skills were delayed. Even though the twins mental and cognitive skills were more advanced than their motor skills overall, the twins lagged behind children their age. Dr. Cooper determined that both children suffered from cerebral palsy. She asserted that their cerebral palsy was as a result of their prematurity. Moreover, both twins would need educational and physical therapy to make advancements in their life skills.
Prior to the trial, Jerrilyn Conner settled her claim against Dr. Stelly in the amount of $100,000.00 on January 26, 1999. Additionally, Conner reserved the right to proceed against the PCF for amounts exceeding $100,000.00. Lake Area Medical Center was dismissed as a defendant when Dr. Stelly took sole responsibility for committing medical malpractice. On April 9, 2001, the claims of Payton and Holly Crawford, Ms. Conner's oldest children from a previous relationship, were dismissed. Since settlement had been reached, Dr. Stelly was a nominal defendant, and the PCF was the primary defendant at trial. On January 30, 2002, Jerome Conner's cause of action was dismissed, with prejudice, for failure to appear in court.
On February 1, 2002, the jury returned a verdict awarding Jerrilyn Conner $462,431.12 subject to a credit of $100,000.00, together with legal interest from the date of judicial demand, until paid, together with all costs. All costs were assessed against PCF. Judgment was entered consistent with the verdict on the same day.

III.

LAW AND DISCUSSION

Legal Cause
To properly address this issue, we must determine whether Dr. Stelly's failure to perform a complete tubal ligation, resulting in a defective twin pregnancy, falls within the scope of protection afforded by the duty breached.
Under La.R.S. 40:1299.39A(4), "`[m]alpractice' means the failure to exercise the reasonable standard of care specified and required by Subsection B of this Section, in the provision of health care, when such failure proximately causes injury to a patient, as provided in Subsection B of this Section." Subsection B of La.R.S. 40:1299.39 states: "The standard of care specified and required by this Section for licensed physicians ... shall be the same as that required to be proven with respect to them under the provisions of R.S. 9:2794." La.R.S. 9:2794, paragraph A, requires the following:
In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., ... the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale, where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

*1108 (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
Dr. Stelly's failure to successfully complete Ms. Conner's tubal ligation resulted in an unwanted and unprepared pregnancy. Dr. Stelly owed a duty under La.R.S. 40:1299.39(B)(1) to Ms. Conner to properly perform the surgical procedure as requested. However, this duty was breached when Dr. Stelly failed to cut the right fallopian tube completely. Further, the harm was exacerbated when Dr. Stelly failed to inform Ms. Conner that the pathology report indicated that one layer of the tube had not been severed. If Dr. Stelly had informed Ms. Conner of the results of this report, Ms. Conner could have exercised preventative measures which would eliminate any chance of pregnancy. Further, "if the plaintiff [Ms. Conner] probably would have not sustained the injuries but for the defendant's substandard conduct, such conduct is a cause in fact." Roberts v. Benoit, 605 So.2d 1032, 1042 (La.1991). "Because substandard conduct does not render the actor liable for all consequences spiraling outward until the end of time, the concept of proximate cause or legal cause (scope of the duty in the duty-risk analysis) is necessary to eliminate liability at some point." (Citation omitted). Nicholson v. Calcasieu Parish Police Jury, 96-314, p. 6 (La.App. 3 Cir. 12/11/96); 685 So.2d 507, 511.
Critical to this case is "whether the injury [Conner] sustained was within the contemplation of the duty." Roberts, 605 So.2d at 1044. "In short, the scope of protection inquiry asks `whether the enunciated rule or principle of law extends to or is intended to protect this plaintiff from this type of harm arising in this manner.'" (Citation omitted). Id. at 1044-45.
In determining the limitation to be placed on liability for a defendant's substandard conducti.e., whether there is a duty-risk relationshipwe have found the proper inquiry to be how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced. (Citation omitted). Restated, the ease of association inquiry is simply: "How easily does one associate the plaintiff's complained-of harm with the defendant's conduct? ... Although ease of association encompasses the idea of foreseeability, it is not based on foreseeability alone." (Citation omitted). Absent an ease of association between the duty breached and the damages sustained, we have found legal fault lacking. (Citations omitted).
Id. at 1045.
In this case, we find that Dr. Stelly could not have reasonably foreseen that a botched tubal ligation would result in the birth of twins with cerebral palsy. We agree that the incomplete ligation could result in pregnancy and possibly twins. However, the connexity between a botched tubal ligation to premature twins with cerebral palsy is too remote. Statistically, the percentages do not indicate that the risk of twins being born premature with cerebral palsy is great. First, not all twins are born premature. According to the record, the risk of prematurity in twins is 30%. The incidence of twin births is 1.5%. Second, even though twins are at risk of developing cerebral palsy, singleton births develop this condition as well. As a result, the birth of premature twins with cerebral palsy due to an unsuccessful tubal ligation did not fall within the scope of protection afforded by the duty owed in this case. Dr. Stelly did not owe a duty to the mother or the twins to protect from the risk of developing cerebral palsy with its attendant medical costs. Cf. Pitre v. *1109 Opelousas General Hospital, 530 So.2d 1151 (La.1988).

Excessiveness of Damage Award
Defendants argue that the damages awarded to Jerrilyn Conner for the wrongful conception claim were clearly excessive. We disagree.
In Duncan v. Kansas City Southern Railway Co., 00-0066 (La.10/30/00); 773 So.2d 670, writ dismissed, 532 U.S. 992, 121 S.Ct. 1651, 149 L.Ed.2d 508 (2001), the supreme court reviewed whether damages awarded to the parents of three passengers in a church van that collided with a train at a railroad crossing were excessive. In its discussion, the court stated the following:
General damages are those which may not be fixed with pecuniary exactitude; instead, they "involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms." (Citations omitted). Vast discretion is accorded the trier of fact in fixing general damage awards. (Citations omitted). This vast discretion is such that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Thus, the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Youn, 623 So.2d at 1260. As we explained in Youn:

Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award. Id. at 1261.
Id. at 682.
Youn controls. General damages are within the discretion of the trial court. Unless there is an abuse of discretion, we are not at liberty to disturb the award of the lower court. We find that there is no abuse of discretion here. Pursuant to Pitre, Conner may receive damage awards for her pain and suffering, emotional and mental state, expenses incurred during pregnancy and delivery, as well as loss of enjoyment of life. However, she cannot receive damages for future medical expenses of the twins unless she can show that the alleged misconduct falls within the scope of Dr. Stelly's duty. As stated earlier, we do not find that she has met this legal cause inquiry. Moreover, it is not our duty to determine the appropriateness of this award.

Apportionment of Fault
Defendants assert that the jury failed to apportion any fault to Ms. Conner. The PCF asserts that Ms. Conner's trip to Louisiana contributed to her pre-term labor. Moreover, her failure to follow doctor's orders caused her to deliver the babies prior to term. We disagree.
In an action for injury or loss, the trier of fact shall determine the degree or percentage of fault of all persons found to have contributed or caused that injury or loss. La.Civ.Code art. 2323. When apportioning fault, the factfinder should consider the five factors enunciated in Watson, which include: 1) whether the conduct resulted from inadvertence or involves an awareness of *1110 danger; 2) how great a risk was created by the conduct; 3) the significance of what was sought by the conduct; 4) the capacities of the actor, whether superior or inferior; and, 5) any extenuating circumstances which might require the actor to proceed in haste without proper thought. Watson v. State Farm, 469 So.2d 967 [La.1985]. (Citation omitted). The findings of percentages of fault are factual determinations, which will not be disturbed in the absence of manifest error. (Citation omitted).
Fontenot v. Southwestern Offshore Corp., 00-1722, p. 4 (La.App. 3 Cir. 6/6/01); 787 So.2d 588, 591, writ denied, 01-1913 (La.10/12/01); 799 So.2d 504.
The record indicates that Ms. Conner's doctor was concerned about her traveling while pregnant with the twins. However, he did not prohibit her travel. In fact, her physician told her that if she traveled on the ground, it would be best to "stop, walk around every hour, get out and walk around every hour for 10, 15 minutes, rest if necessary, and then resume [her] travel." As instructed, Ms. Conner followed Dr. Wilson's orders. Unfortunately, Ms. Conner had no family or friends who could help her care for the children. Ms. Conner already had four children prior to the pregnancy. Two of these four were still infants. As a result, she drove to Louisiana for the purpose of obtaining help with the care of her children. Ms. Conner's maternal grandmother was the only person who could assist her at that time. However, she could not travel to North Carolina on her own. As a result, Ms. Conner's conduct was not abrupt nor was it done out of haste. Ms. Conner's only concern was the care of her twins. Under the Watson factors, Conner could not have known that traveling to Louisiana, following her doctor's instructions, would cause her to deliver the twins early. As a result, fault cannot be apportioned to Ms. Conner.

Exclusion of Dr. Neil Mitchell's Testimony
The PCF asserts that Dr. Neil Mitchell's testimony does not satisfy the requirements of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Dr. Neil Mitchell, an expert witness, testified in his deposition to Ms. Conner's mental status after delivery of the twins. The Daubert test, which was adopted by the Louisiana Supreme Court in State v. Foret, 628 So.2d 1116 (La.1993), determines whether expert witness testimony will be admitted into evidence. Prior to trial, several motions were made by the PCF. Those motions included Daubert motions. The trial court denied the defendants' Daubert motions, and the PCF sought writs.
On April 8, 1999, PCF filed an emergency application for supervisory writs, from its March 9, 1999 judgment denying the applicant's exception of no cause of action and no right of action with this court. On April 27, 1999, we denied PCF's writ. Additionally, PCF's application for writs was further denied by the supreme court on July 2, 1999. As a result, the "law of the case" doctrine applies.
The law of the case principle relates to (a) the binding force of trial court rulings during later stages of the trial, (b) the conclusive effects of appellate rulings at the trial on remand, and (c) the rule that an appellate court will ordinarily not reconsider its own rulings of law on a subsequent appeal in the same case (Citation omitted).... The reasons for this doctrine are: (1) avoidance of indefinite litigations; (2) consistency of results in same litigation; (3) essential fairness between the parties; and (4) judicial efficiency. (Citations omitted). "[T]he *1111 doctrine is discretionary and should not be applied where it would effectuate an obvious injustice or where the former appellate decision was clearly erroneous." (Citation omitted). Moreover, the doctrine applies with equal force to writ decisions as it does to judgments rendered at the conclusion of the appellate process. (Citation omitted).
Kaleel v. Division Transport, 00-803, p. 1-2 (La.App. 3 Cir. 8/23/00); 769 So.2d 110, 111, writ denied, 00-2976 (La.12/15/00); 777 So.2d 1232.
Dr. Mitchell's testimony is relevant to show how Ms. Conner's unwanted pregnancy has caused her to become clinically depressed. After the birth of the children, Ms. Conner sought the help of Dr. Mitchell to overcome anxiety and panic related to her depression. This testimony indicates that the birth of the twins were not only an economic burden, but an emotional one as well. Conner sought to take care of her children; however, her existing circumstances made it difficult for her to do so. For this reason, we will not reconsider our prior ruling of law on this issue, and this assignment is without merit.

Validity of Wrongful Life/Wrongful Birth Claims
The PCF asserts that there is no remedy under Louisiana law for "wrongful birth" and/or "wrongful life" causes of action. We disagree.
In Pitre, 530 So.2d 1151 (La. 1988), a mother gave birth to an albino child, despite undergoing a bilateral tubal ligation at Opelousas General Hospital. Unaware that the tubal ligation was unsuccessful, Pitre became pregnant and her daughter was "born with the congenital defect known as albinism." Id. at 1153. Like Ms. Conner, Pitre sought general damages for expenses incurred during the pregnancy and delivery as well as emotional and mental distress. Id. Additionally, Pitre requested costs for rearing the child, special expenses for the child's deformity, and expenses for the change in family status. Id.
"The trial court overruled the various motions and exceptions filed by the three defendants including exceptions of no cause of action, motions for summary judgment, and a motion to strike those portions of the petition concerning the `wrongful life' action and certain damages alleged by [the Pitres] individually." Id. at 1153-54. On appeal, the court sustained the exception of no cause of action as to the "wrongful life" claim of Hannah Pitre. Further, the court limited Pitre's recovery of damages to "expenses incurred during the pregnancy and delivery and limited those of Dwain Pitre [father of the child] to loss of consortium, service, and society and expenses incurred during pregnancy, delivery, and post delivery." (Citation omitted). Id. at 1154. In Pitre, the supreme court reviewed the appellate court decision and affirmed its ruling that the Pitres were entitled to general damages, which they suffered during pregnancy and delivery. In addition, it also found that the defendant's exception of no cause of action on the child's claim was properly sustained; however, in the "interests of justice," the Pitres were given "30 days from the finality of [the supreme court] decision within which to amend the petition, if they [could], to remove the grounds of the objection noted in [the appellate] opinion." Id. at 1162.
The PCF argues that under the Pitre analysis a physician does not owe a duty to protect a child from the risk of some birth defect nor are the parents entitled to damages associated with the child's deformity. We assert that Pitre does not exclusively eliminate a cause of action when the doctor *1112 could have reasonably foreseen the child's defect.
The supreme court stated in Pitre:
Although we conclude provisionally that under the facts alleged in the petition the doctor did not owe a duty to protect the child from the risk of albinism, we reject defendant's arguments calling for a categorical denial of any duty on the part of a physician to protect an unconceived child from being born with a defect. When a physician knows or should know of the existence of an unreasonable risk that a child will be born with a birth defect, he owes a duty to the unconceived child as well as to its parents to exercise reasonable care in warning the potential parents and in assisting them to avoid conception of the deformed child. The time has come when we can and should say that each person owes a duty to take reasonable care to avoid acts or omissions which he can reasonably foresee would be likely to injure a present or future member of society unless there is some justification or valid explanation for its exclusion. (Emphasis added).
Pitre, 530 So.2d at 1157.
In Pitre, the court concluded that the physician did not owe a duty to the unborn child to protect her from risk of being born with albinism. The court could not find through its research that albinism was "easily predicted or foreseen by a treating physician." Id. at 1158. Further, "the plaintiff's petition [did] not contain any allegation that the defendant knew or should have known of the risk of this abnormality." Id.
In this case, Ms. Conner alleged that the development of cerebral palsy in her twins would not have occurred but for the botched tubal ligation. Unlike the plaintiff in Pitre, Conner alleged that Dr. Stelly knew or should have known of the risk of this abnormality. We reiterate that there is no closer association between the botched tubal ligation and cerebral palsy than there is between the botched tubal ligation and albinism in Pitre based on our legal cause analysis.
In Pitre, general damages were awarded to the mother based on her doctor's failure to inform. The court concluded that these damages were foreseeable. However, it did not award Pitre special damages concerning the child's deformity because "these [were] not consequences which were caused by impact on the person of the mother or which a reasonable practitioner would expect to follow from the conduct as alleged in the petition." Id. Specifically, the Pitre court could not find that a doctor could have reasonably foreseen that albinism might result based on its knowledge of the disorder. The same holds true for cerebral palsy.
Under the facts in this case, we cannot grant Ms. Conner future medical expenses for the children. We do not find that the botched tubal ligation would result in cerebral palsy. We agree legally that Pitre permits a cause of action when the parents can demonstrate that the doctor could have reasonably foreseen that a defect would arise from the botched tubal ligation.

Assessing Costs
The PCF complains that the costs were excessive and that the plaintiff should have been sanctioned for requesting such costs. The Fund is particularly at issue that costs were assessed for the depositions of Dr. Voogt and Dr. Rice, which were not used at trial. We find that these costs were reasonable.
Under La.R.S. 13:4533, entitled "Cost of officers, depositions, etc., taxed as costs, [t]he costs of the clerk, sheriff, witness' fees, costs of taking depositions and copies *1113 of acts used on the trial, and all other costs allowed by the court, shall be taxed as costs." (Emphasis added).
Dr. Voogt's and Dr. Rice's deposition testimonies were not used at trial because the court determined that Dr. Cooper's testimony sufficiently demonstrated that the Conner twins would need medical care in the future. Additionally, editing of Dr. Voogt's video deposition was required. The court found that it was not necessary to enter these depositions into evidence. However, the depositions were prepared and available for introduction at the time of trial. As a result, plaintiffs should not be sanctioned for requesting such costs.

IV.

CONCLUSION
For the foregoing reasons, the judgment of the trial court, awarding Jerrilyn Conner $462,431.12 in damages, is affirmed. We decline to increase the award to Ms. Conner for loss of enjoyment of life and conclude that an award of damages for the future medical costs of the Conner twins is inappropriate. Costs of this appeal are assessed to defendant-appellant, the Louisiana Patient's Compensation Fund.
AFFIRMED.
NOTES
[1] In the petition for damages, the plaintiff's name was spelled "Jerome."