433 So.2d 254 (1983)
Pamela Ann DUVERNAY, Individually and as Tutrix, etc.
v.
STATE of Louisiana, Through the DEPARTMENT OF PUBLIC SAFETY, DIVISION OF STATE POLICE, et al.
No. 82 CA 0255.
Court of Appeal of Louisiana, First Circuit.
May 17, 1983.
Rehearing Denied June 29, 1983.
*256 Andrew Jack Bennett, Jr., Bennett & McLaughlin, Baton Rouge, for defendant, first appellant.
Paul Marks, Jr., Owen, Richardson, Tylor, Mathews & Atkinson, Baton Rouge, for defendant, second appellant.
H. Evans Scobee, Durett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, for defendant & third party defendant, appellee.
W. George Bayhi, Baton Rouge, for defendant, appellee.
R. Ryland Percy, Percy & Percy, Gonzales, for plaintiff, appellee.
Before COVINGTON, LEAR and LANIER, JJ.
LEAR, Judge.
Pamela Ann Duvernay, individually and as tutrix of her minor children, Dustin Michael and Amber Michelle, brought suit against Clarence J. Ernest, Jr. and his liability insurer, State Farm Mutual Automobile Insurance Company, Sheriff Harold L. Tridico and his deputies and their liability insurer, North River Insurance Company, The State of Louisiana, Department of Public Safety, Division of State Police and the Department of Transportation and Development (DOTD) for the wrongful death of Darryl Duvernay. Later Blaine Melancon was named as a party defendant.

FACTS
This suit involves a traffic accident which occurred during the early morning hours of June 7, 1980, at the intersection of Louisiana Highway 30 and Louisiana 73 in Ascension Parish, Louisiana, in which Darryl Duvernay was killed. At about 4:00 a.m. June 7, 1980, after receiving a complaint, Gonzales City Policeman Hardy Bishop reported to Deputy Blaine Melancon, the dispatcher for the Ascension Parish Sheriff's Office, that there was a malfunction in the traffic signal controlling the intersection of La. 73 and La. 30 in Ascension Parish. Upon receiving this information, Deputy Melancon sent a teletype message to Troop A of the Louisiana State Police. After sending this message, Melancon did not have the intersection secured or take any further action concerning the intersection.
The teletype was received by Officer Bobbie Messer, the radio operator for State Police Troop A, about 5:00 a.m. the same morning. The radio officer had not notified the Highway Department at the time the accident happened about one hour later.
The accident occurred at approximately 6:00 a.m., when Duvernay drove his motorcycle into the intersection, westbound on La. 73. The green light was on facing Duvernay.
Ernest, the driver of the pickup truck involved in the accident, was approaching the intersection on La. 30 northbound from Gonzales. The red light in the traffic signal appeared to be operating normally. As Ernest approached the intersection, he noticed that the light facing him was not *257 operating. He merely slowed his vehicle before proceeding into the intersection. The two vehicles entering the intersection at approximately the same time, collided in the intersection; as a result, Duvernay was killed.
After trial, the court below rendered judgment in favor of the plaintiff and against the defendants, Clarence J. Ernest, Jr. and his liability insurer, State Farm Mutual Automobile Insurance Company, to the extent of its coverage; Deputy Blaine Melancon and his liability insurer, The North River Insurance Company, to the extent of its coverage; and the State of Louisiana, Department of Public Safety, Division of State Police, in solido, in the sum of $978,067.93. Judgment was rendered in favor of DOTD and Sheriff Tridico. A settlement was subsequently entered into whereby the North River Insurance Company and its insureds, Deputy Melancon and Sheriff Tridico were released, reserving all rights against the other defendants. The judgment has been appealed to this Court. We reverse in part and affirm in part.

Liability of Ernest
The negligence of Ernest and liability of his insurer are clearly established from the record. The evidence established that Clarence J. Ernest, Jr. was familiar with the intersection in question. For at least five weeks prior to the accident, he crossed the intersection five or six times per week on his way to and from work. Ernest admitted that on the day of the accident prior to entering the intersection he was aware that the traffic signal he was approaching was not functioning properly, yet he did not stop or take any precautions at the intersection, but merely slowed down slightly, and then entered the intersection going about 40 miles per hour. The accident occurred when the front end of the pickup truck collided with the side of the Duvernay motorcycle.
A duty of extreme caution is imposed upon a motorist approaching an intersection with a non-operative traffic light. To enter such an intersection without slowing down or stopping to ascertain whether the crossing can be safely negotiated is imprudent and is held to constitute negligence in legal contemplation.
The case of Soprano v. State Farm Mutual Automobile Insurance Company, 165 So.2d 308, 311 (La.1964), dealt with a similar situation and established that once a traffic signal has been installed, the signal device controls as long as it is reasonably visible, whether or not it is functional:
Should the device become non-operative, as in this case, the duty of an approaching motorist is then to exercise extreme caution at such an intersection and not to proceed therein until he ascertained that he can negotiate the intersection with safety. (Emphasis added).
The trial judge found that Ernest's negligence was a cause in fact of the collision which is the subject of this litigation. Due to the approaching motorcycle, it was unsafe to enter and attempt to cross the intersection. Ernest should have seen the motorcycle; thus to attempt to cross the intersection in view of the approaching motorcycle constituted negligence. Under the law Ernest is presumed to have seen what he should have seen. Young v. Sea Insurance Company, 173 So.2d 362 (La.App. 1st Cir.1965). Ernest breached the duty of extreme caution owed by him to other motorists by entering this intersection when apparently it could not be safely traversed.
This Court agrees with the trial court's finding that Ernest breached the duties he owed to fellow motorists such as Darryl Duvernay. He should have proceeded through the intersection only after having slowed or stopped to make certain it was safe to do so. His actions in merely slowing down a little before entering the intersection constitute negligence on his part, making him and his insurer, State Farm Mutual Automobile Insurance Company to the extent of its coverage, liable to the plaintiff for the damages sustained as a result of the accident.

Liability of Deputy and Sheriff's Office
On the question of the liability of the Sheriff, the Deputy and their insurer, the *258 trial court found that at about 4:00 on Saturday, June 7, 1980, while Officer Bishop of the Gonzales Police Department was at a truck stop, he was informed that there was a malfunction of some sort in the traffic light controlling the nearby intersection of La. 30 and La. 73. Bishop testified that he went to his patrol car and advised Deputy Melancon, the Sheriff's Department dispatcher on duty at the time, of the information he received. However, Deputy Bennett Delaune, who was patrolling the east bank of Ascension Parish at the time, overheard the radio communication to Deputy Melancon and he told Melancon by radio that he had passed through the intersection thirty minutes earlier and had noticed no defects in the traffic light in question. Deputy Melancon also received a phone call to the effect that the traffic light was not operating properly. According to Deputy Melancon, these three communications were received by him within a matter of a few minutes of each other. Melancon testified that at about 4:30 a.m., shortly after receiving this information, he sent the following teletype message to the State Police Troop A:
WHEN YOU HAVE TIME PLEASE NOTIFY THE HIGHWAY DEPARTMENT THAT THE SIGNAL LIGHT AT THE INTERSECTION OF LA-73 AND LA-30 IS MALFUNCTIONING THE LA-30 EASTBOUND LIGHT IS STUCK ON RED AND THE LA-30 WESTBOUND LIGHTS HAVE NO LIGHTS AT ALL.
The message was received by the State Police about 5:00 a.m. (or within a few minutes after 4:52 a.m., about an hour prior to the accident in question). He went off duty at 5:00 a.m. on the morning in question, and he did not advise the officer relieving him, or anyone else in the Sheriff's Department, of the malfunctioning traffic light and of his teletype communication to the State Police.
Melancon failed to dispatch a patrol car to secure the intersection, or to recontact the State Police after not receiving a reply from them to ascertain that the message was received. In fact, he took no further actions with respect to the reports of the malfunctioning traffic light.
Considering the foregoing facts, the trial court found that Melancon's action and inaction were a cause in fact of the accident in question. But for his negligence, the accident would not have happened. The trial court then held that once the Sheriff and his deputies had knowledge of such a dangerous condition, they had the obligation and duty to do all reasonably within their authority to protect against the dangerous situation. In so holding, the trial judge remarked:
They can not merely sit back and rely on other law enforcement agencies and lay persons to remedy such a dangerous situation which they have the time and capacity to remedy themselves. This duty placed upon a Sheriff and his deputies with knowledge of such a dangerous condition must be differentiated from that of a lay person with the same knowledge. Since the Sheriff and his deputies have the authority to act, their duty goes beyond that of an ordinary lay person. The Sheriff and his deputies, armed with knowledge, must do all within their power reasonably calculated to remedy the dangerous situation. Of course, the extent of the duty placed upon the Sheriff and his deputies and the determination of what action should or should not be taken will depend on the facts of each particular case.
As did the trial court, we find that once Deputy Melancon became aware of the dangerous traffic situation that existed, he then had the duty to take affirmative action to see that motorists, such as Duvernay, were not subjected to unreasonable risks of harm. He did not fulfill his duty merely by sending the teletype message to the State Police. He was required to do more. He should have ascertained if the message was received. He should have either dispatched a patrolman to the scene immediately or made sure the State Police sent a trooper to secure the intersection. He should have made his replacement fully *259 aware of the circumstances. We agree with the trial judge that the intersection could and should have been secured by the Sheriff's Department prior to the accident. Deputy Melancon breached the duty placed upon him. The deputy and his insurer to the extent of its coverage were properly held to be solidarily liable with Ernest and his insurer for the damages sustained by the plaintiff as a result of the accident.
However, we find that the trial court erred in not also finding the Sheriff liable in his official capacity as the employer of Deputy Melancon for the deputy's tort committed in the course and scope of his employment. Jenkins v. Jefferson Parish Sheriff's Office, 402 So.2d 669 (La.1981).
As pointed out above, the Sheriff, the Deputy and their insurer have settled with the plaintiff, so that their negligence and liability are not issues except insofar as they bear upon the liability of the other defendants herein and the issue of contribution.

Liability of DOTD
Turning now to the question of liability of the Department of Transportation and Development (DOTD), plaintiff alleges that the accident was also caused by the negligence of the DOTD and that DOTD is liable as the owner or custodian of the traffic signal in question under the strict liability doctrine of LSA-C.C. art. 2317, as construed by the Louisiana Supreme Court.
The evidence established that the reason the signal light was not operating was because the red lens facing Ernest has been shot out by some unknown third person some time prior to the accident. It is undisputed that DOTD did not have any knowledge of the malfunctioning condition of the traffic light until some time subsequent to the happening of the accident. With respect to whether DOTD was negligent in causing the collision, no evidence was introduced to show that any action or inaction on the part of DOTD was a cause in fact of the accident. Furthermore, the duty of DOTD to repair the inoperable traffic light can come in existence only after it knew or should have known that the traffic light was not functioning. We agree with the trial court's finding that there was insufficient time between the shooting out of the red lens and the accident to charge DOTD with the knowledge of the malfunctioning traffic light. Moreover, as discussed above, DOTD had no actual knowledge of the condition of the traffic light until after the accident happened. We therefore find that DOTD breached no duty that it owed to Darryl Duvernay. We also hold that DOTD is not liable to the plaintiff under the doctrine of strict liability. One of the defenses to liability under Article 2317 is fault of a third party. See Loescher v. Parr, 324 So.2d 441 (La.1975); American Road Insurance Company v. Montgomery, 354 So.2d 656 (La.App. 1st Cir.1977), writs denied 356 So.2d 430, 434, 435 (La.1978). It was established that the defective condition of the traffic control light was caused by the intentional act of some unknown third person, and DOTD was properly dismissed from this action.

Liability of State Police
With regard to the question of the negligence of the State Police, the trial court found this defendant solidarily liable with Ernest and Deputy Melancon (and their respective insurers) based on the action or inaction of the State Police teletype operator in response to the message sent to the State Police requesting that at its convenience the State Police should notify the Highway Department of the malfunctioning of the traffic light at the intersection of La. 30 and 73. We find that the trial court erred in holding the State Police liable based on the evidence in the record. The message from Melancon was received in the office of Troop A just before 5 a.m., about one hour prior to the accident which caused the death of Duvernay. There was nothing in the message which would indicate to a reasonable person or to an experienced police officer that the Highway Department should be notified immediately of the malfunctioning light. In fact, it is implicit in the message that the Sheriff's office has the situation well in hand and that the *260 State Police could routinely inform the Highway Department of the non-operative signal. In any event, it is unrealistic to assume that the Highway Department could have repaired the traffic signal within the hour. The only actions which could have prevented the present accident once Mr. Duvernay started his motorcycle trip was the securing of the intersection by law enforcement officers and the cautious entering and crossing of the intersection by Mr. Ernest. But for Mr. Ernest's failure to be extremely cautious as the law required under the particular circumstances and but for the failure of law enforcement officers to secure the intersection, this particular collision in all probability could have been avoided.
Under the circumstances of the instant case, the Sheriff's office had the primary duty to secure the intersection. The Sheriff through one of his deputies was officially notified of the malfunctioning traffic signal. The Sheriff's office has the responsibility to do whatever was necessary to protect the public from the hazard of a malfunctioning traffic signal. The Highway Regulatory Act, LSA-R.S. 32:5, designates all law enforcement officers having the proper authority (which includes Sheriff's offices) to enforce highway regulations, which include controlling traffic under a given situation. In the instant case the Sheriff's responsibility was not fulfilled merely by notifying a brother law enforcement office of a malfunctioning signal at the particular intersection. The Sheriff's office had the further obligation to secure the intersection so that the motoring public would be reasonably protected until the operability of the traffic signal could be restored. This duty was breached, as we have discussed above, by the Sheriff's office.
We find that under the particular circumstances of the present case, the State Police had no duty to respond to the information that it received from a brother law enforcement agency by securing the intersection in question. Its proper response to the message it received was to routinely advise the Highway Department that the traffic signal needed repairs. There is not the slightest intimation in the message that the Sheriff's office desired to turn the matter over to the State Police for handling. The State Police were merely requested to relay information to the Highway Department. It was not requested to assist in the securement of the intersection.
We thus find that the trial court erred in finding that the State Police was liable to the plaintiff. The evidence establishes no breach of duty on the part of the State Police. We hold that the risk of harm encountered by the deceased as he attempted to negotiate the highway intersection, under the particular circumstances of this case, did not fall within the scope of protection which the State Police was under a duty to extend inasmuch as the Sheriff's office had already undertaken this traffic control mission. On the basis of this analysis, the State Police breached no duty related to this accident and is not liable for the damages sustained by the plaintiff. See Lochbaum v. Bowman, 353 So.2d 379 (La. App. 4th Cir.1977), writ denied 354 So.2d 1380 (1978). We disagree with the trial court's finding that the State Police was negligent and reverse that portion of the judgment.

Quantum
Having found that defendants Clarence J. Ernest, Jr. (and his liability insurer to the extent of its coverage), Deputy Blaine Melancon (and his liability insurer to the extent of its coverage) and Sheriff Harold L. Tridico (and his liability insurer to the extent of its coverage) are liable to plaintiff in solido for the damages sustained as a result of said accident, the Court must now determine whether or not the trial court clearly abused its discretion in making its award. Reck v. Stevens, 373 So.2d 498 (La. 1979); Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). Plaintiff requests recovery for the support, both past and future, which she and her children have lost as a result of the accident, for general damages for mental anguish and distress they have and will suffer as a result of *261 Darryl Duvernay's death and for special damages for funeral expenses incurred. We find no abuse of the trial court's much discretion.

A. Loss of Support:
As indicated previously, the accident in question occurred on June 7, 1980. The trial began on March 24, 1981. At the time of the accident and for approximately three years prior thereto, Darryl Duvernay was employed by Shell Chemical Company at its Geismar, Louisiana plant as a process technician. He worked on a rotating twelve-hour shift. He was 24 years old. The income tax returns introduced in evidence reveal that Darryl Duvernay's earnings prior to the accident were as follows:
(a) calendar year 197724,481.00;
(b) calendar year 197828,069.00;
(c) calendar year 197932,946.00; and
(d) January 1, 1980June 7, 198018,303.12.
On this issue of loss of support, plaintiff presented the testimony of Dr. Jan Duggar. On behalf of the defendants, Dr. Johathan Wood testified on this issue. Both were accepted by the trial court as experts in the field of economics. Both experts agreed that at the time of trial, Duvernay had a work-life expectancy of 37 years.
Before determining the extent of loss of support, it must first be ascertained the amount of income Duvernay was earning at the time of his death. Dr. Duggar and Dr. Wood disagreed on this issue. Dr. Duggar was of the opinion that Duvernay was earning $36,050.00 per year (i.e., $3,050.00 per month), at the time of his death. He figured this amount by reviewing Duvernay's actual income between January 1, 1980 and June 7, 1980. Dr. Wood averaged the actual income of Duvernay for the full twelve-month period prior to Duvernay's death, and calculated that Duvernay was earning $34,396.48 per year (i.e. $2,866.37 per month), at the time of his death. Although both experts were firm in their opinion on this issue, the trial court accepted Dr. Wood's estimate as being more reasonable than Dr. Duggar's. Dr. Wood based his opinion on actual income earned by Duvernay. Dr. Duggar's opinion is based on a figure he assumed Duvernay would earn for the seven-month period following his death. This Court is of the opinion that the trial judge had a reasonable basis for his finding that Dr. Wood laid a better foundation for his opinion on this issue, and in accepting his opinion on this issue over that of the plaintiff's expert.
Plaintiff did not dispute the fact that she is not entitled to recover that portion of Duvernay's earnings that would have been used for his own personal maintenance and consumption. Dr. Duggar testified that Duvernay would require 15% of his earnings for his personal maintenance and consumption until his youngest child became 18 years old, and that he would require 25% of his earnings for the same purposes thereafter. On this issue, Dr. Wood testified that Duvernay's earnings should be reduced by 17% until his youngest child reached 18 and 34% thereafter. Both experts seemingly based their opinion on sound factual data. However, we agree with the trial court's finding that it is more reasonable in this case to reduce Duvernay's earnings by 25% during his entire work-life expectancy so as to reflect more realistically that portion of his earnings which would have been used and consumed by him for his own personal maintenance and support.
With this background, it became feasible for the trial judge to determine the amount of support plaintiff and her children lost prior to the trial as a result of Duvernay's death. Mr. Duvernay died on June 7, 1980. The trial was held approximately eight and one-half months later. If he had not died, Duvernay would have earned $24,354.15 prior to trial ($2,866.37 per month for 8.5 months). From this amount, the 25% representing the amount of the earnings which would have been used by Duvernay for his own personal consumption and maintenance must be deducted. We agree with the trial court's finding that consumption and maintenance must be deducted. Hence we agree with the trial court findings that the total support lost by plaintiff prior to trial was $18,273.11.
*262 To determine the loss of future support, it became necessary for the trial court to first increase Duvernay's base annual income ($34,396.48) yearly through his work-life expectancy by a percentage representing his expected annual increase in income. Then in order to determine the present value of the income, that amount had to be discounted by an appropriate percentage. Finally, from that amount, the 25% representing that portion of these earnings Duvernay would have used and consumed for his own support and maintenance had to be deducted.
Dr. Duggar and Dr. Wood expressed different opinions on the percentage wage increase and discount rate to be used in determining loss of future support. Dr. Duggar was of the opinion that the growth factor should be 5.8% per year. He arrived at this conclusion by averaging the annual increases in wages for Louisiana workers over the past 30 years. Dr. Wood testified that a growth factor of 3% to 6% would be more appropriate.
Since the evidence established that the actual rate of wage increase over the past ten years at the Shell Chemical Plant for employees in Duvernay's position was 8.7%, that over the past ten years the average yearly wage increase in the petro-chemical industry was 9% and that Duvernay's own actual average yearly wage increase over the past four years was 14%, a yearly growth factor of 5.8% as expressed by Dr. Duggar is reasonable under the facts and circumstances of this particular case. The trial court accepted this growth factor and we find no error in its doing so.
The two experts also had different opinions on the discount rate to be used. Dr. Duggar was of the opinion that use of a 5% or 6% discount rate would be appropriate. Dr. Wood stated that considering the interest rates being paid on investments at the time of trial, the minimum discount rate to be used in this particular case should be 11%.
The trial court declined to accept the opinion of either expert on this issue. Considering the extended work-life expectancy involved, the trial court found Dr. Wood's estimation to be too high; because investments at the time of trial were yielding a good return, the court found Dr. Duggar's estimation to be too low. The judge decided that it would be reasonable to average the two estimations, and concluded that a discount rate of 8% was appropriate.
Consequently, using a yearly growth rate of 5.8%, a discount rate of 8% and deducting 25% therefrom for his personal maintenance and support, the trial court determined that the present value of loss of future support incurred by the plaintiff as a result of Duvernay's death amounted to $656,794.82. This supported by the evidence.

B. General Damages
It is without question that plaintiff and her children have and will suffer greatly because of the death of Darryl Duvernay. The evidence established that Mr. Duvernay was a good husband and father to his wife and children. He spent considerable time with them. His children will greatly miss his love, companionship and training. His wife has and will suffer greatly because of the untimely death of her husband. We agree with the trial judge's award of general damages for $150,000.00 for Pamela Duvernay, and $75,000.00 for each of the two minor children for the mental pain, suffering and distress and loss of love, affection, companionship and training as a result of the death of Darryl Duvernay.

C. Funeral Expenses:
Also, plaintiff has proved and is entitled to the award made by the trial court of $3,000.00 for funeral expenses.

Effect of the Settlement
The other significant issue raised on this appeal is the amount of reduction in the award to which Ernest and his insurer are entitled due to the settlement between the plaintiff and the Sheriff, the Deputy and their insurer. Since the settlement prevents contribution from a joint tortfeasor, *263 the remedy provided by law in such cases is to reduce the award proportionately, depending on the number of joint tortfeasors. When a plaintiff releases a joint tortfeasor, the unreleased joint tortfeasors are effectively deprived of the right of contribution. Recognizing this rule, the case of Harvey v. Travelers Insurance Company, 163 So.2d 915 (La.App. 3rd Cir.1964), holds that the plaintiff in such a situation is only entitled to a proportionate amount of his damages from the unreleased tortfeasor. Raley v. Carter, 412 So.2d 1045 (La.1982); Sibley v. Menard, 398 So.2d 590 (La.App. 1st Cir.1980), writ denied 400 So.2d 211 (La. 1981).
Since this Court has found the State Police not liable, only two tortfeasors remain: the driver of the pickup truck, Ernest, and the Sheriff's office. There is no basis for finding that the Sheriff and his Deputy are two separate joint tortfeasors; there is only one liability imposed on these parties arising out of the negligence of the Sheriff's employee. It is this liability that has been settled with them and their insurer.
Therefore, we hold that the reduction of the plaintiff's recovery should be computed at one-half by virtue of the settlement and release as discussed above.

Conclusion
For the foregoing reasons, with respect to appellee, Pamela Ann Duvernay, individually and as tutrix of the minors, Dustin Michael Duvernay and Amber Michelle Duvernay, the judgment of the trial court is reversed as to its holding relative to the State of Louisiana, through the Department of Public Safety, Division of State Police; the judgment is affirmed in all other respects. The appellee is cast for costs of this appeal.
REVERSED IN PART: AFFIRMED IN PART.