589 So.2d 583 (1991)
Patricia SUHR, Both Individually and as Natural Tutrix of Her Minor Son, James Wesley Suhr
v.
Curtis A. FELTER, Allstate Insurance Company, The State of Louisiana Through the Department of Public Safety & Corrections and Through the Department of Transportation & Development, and the City of Baton Rouge Through the Baton Rouge Police Department and its Chief, Wayne R. Rogillio.
No. CA 90 1075.
Court of Appeal of Louisiana, First Circuit.
October 18, 1991.
Writ Denied January 6, 1992.
*584 Don Beard, Baton Rouge, for plaintiff-appellant Patricia Suhr, etc.
William T. Lowrey, Jr., Baton Rouge, for defendant-appellee City of Baton Rouge City Police.
Before SHORTESS, LANIER and CRAIN, JJ.
LANIER, Judge.
This action is a suit for damages in tort brought by Patricia Suhr, individually and as natural tutrix of her minor son, James Wesley Suhr, for the wrongful death of her husband, Norman Suhr. Mr. Suhr died when the car he was driving went out of control and collided with a vehicle parked on the shoulder of Interstate 10 (I-10) in the City of Baton Rouge. Made defendants were: (1) Curtis A. Felter, the owner of the parked vehicle; (2) Allstate Insurance Company (Allstate), Felter's insurer; (3) the State of Louisiana through the Departments of Public Safety & Corrections (DPSC) and Transportation and Development (DOTD); (4) the City of Baton Rouge through the Baton Rouge Police Department and its chief, Wayne R. Rogillio (City).[1] Defendants denied liability. The trial court rendered judgment for the City that dismissed this suit at plaintiff's costs. Plaintiff then took this devolutive appeal.

FACTS[2]
On July 19, 1985, Curtis Felter and his wife left their home in Morgan City, Louisiana, and traveled in their 1976 Oldsmobile to Baton Rouge, Louisiana, to visit a relative in Baton Rouge General Hospital. At approximately 4:30 p.m., the Felters were on their way back to Morgan City when their car broke down on the eastbound portion of I-10, near the entrance ramp to Acadian Thruway in Baton Rouge. I-10 has three travel lanes in each direction of travel. Within minutes, an unidentified police officer arrived and offered to push the disabled vehicle off the roadway (traveled portion) of I-10. Using the bumper of his squad car, the officer pushed the Felter vehicle to the shoulder of I-10.
Mr. Felter informed the officer that he was from out of town, and he had no money to repair the car or call a tow truck. The officer told Mr. Felter to leave the vehicle on the shoulder temporarily. Mr. Felter told the officer he would return to Morgan City, secure the parts needed to repair the car, and return the next day. At the direction of the officer, Mr. Felter locked his brakes, turned on the emergency flashers and locked the car. Mr. Felter phoned his son-in-law in Morgan City to come to get him and his wife. The police officer brought Mr. and Mrs. Felter back to Baton Rouge General Hospital. The officer gave Mr. Felter five dollars to get something to eat. Early the next morning, Mr. and Mrs. Felter returned to Morgan City with their son-in-law. Mr. Felter got the parts to repair his car.
At approximately 12:00 noon on July 20, 1985, Mr. Suhr was driving his Toyota vehicle in an easterly direction on I-10 when his vehicle went out of control while he was executing a lane change. The vehicle left the roadway and struck the Felter vehicle parked on the shoulder. Mr. Suhr died at the scene of the accident from injuries suffered in the collision. A heavy downpour left water standing on I-10 at the time of the accident.
On the afternoon of July 20, 1985, Mr. Felter returned to Baton Rouge and learned of this tragic accident.

LIABILITY OF THE CITY
The plaintiff contends the trial judge erred by (1) "finding that there was no duty on the part of the officer to use care in the disposition of the disabled vehicle", (2) "finding that the accident was unforeseeable and, therefore, was a risk that did *585 not fall within any duty on the part of the officer", and (3) "failing to find in plaintiff's favor and award damages as prayed." The plaintiff asserts that the police officer was negligent by allowing Mr. Felter to park his vehicle in a place that created a hazard for other vehicles on the roadway of I-10 and by failing to park the vehicle in a safer place.
The legal relationships between plaintiff and the City are provided for in the statutory law and jurisprudence. The applicable statutes are La.R.S. 32:1(25), (59) and (65), 32:2, 32:5, 32:141, 32:142, 32:143, 32:144, 32:296, 32:471, 32:474, 48:1(20) and (21), and 48:342. The following rules found in Bunch v. Town of St. Francisville, 446 So.2d 1357, 1360 (La.App. 1st Cir.1984) are applicable to properly interpret these statutes:

When a law or ordinance is clear and free from all ambiguity, it must be given effect as written....
When interpreting a law (ordinance), the court should give it the meaning the lawmaker intended. It is presumed that every word, sentence or provision in the law was intended to serve some useful purpose, that some effect is to be given to each such provision, and that no unnecessary words or provisions were used. Conversely, it will not be presumed that the lawmaker inserted idle, meaningless or superfluous language in the law or that it intended for any part or provision of the law to be meaningless, redundant or useless. The lawmaker is presumed to have enacted each law with deliberation and with full knowledge of all existing laws on the same subject. The meaning and intent of a law is to be determined by a consideration of the law in its entirety and all other laws on the same subject matter, and a construction should be placed on the provision in question which is consistent with the express terms of the law and with the obvious intent of the lawmaker in enacting it. Where it is possible to do so, it is the duty of the courts in the interpretation of laws to adopt a construction of the provision in question which harmonizes and reconciles it with other provisions. A construction of a law which creates an inconsistency should be avoided when a reasonable interpretation can be adopted which will not do violence to the plain words of the law and will carry out the intention of the law maker....
When the expressions of a law are "dubious", the most effectual way of discovering the true meaning of the law is to consider the reason and spirit of it, or the cause which induced the lawmaker to enact it.... When a law is susceptible to two or more interpretations, that which affords a reasonable and practical effect to the entire act is to be preferred over one which renders part thereof ridiculous or nugatory.... If there is an irreconcilable conflict between the provisions of a law, only one provision can prevail.
(Emphasis added; citations omitted)
See also La.R.S. 1:1 et seq.; La.C.C. art. 9 et seq.; Achee v. Louisiana State Employees' Retirement Board, 527 So.2d 1116, 1118-1119 (La.App. 1st Cir.1988); Notoriano v. Anthony, 527 So.2d 1120, 1121-1122 (La.App. 1st Cir.1988).
Pursuant to La.R.S. 32:1(25) and 48:1(11), a highway is the distance between the boundary lines of every way or place that is publicly maintained and open to the use of the public for the purpose of vehicular travel. Pursuant to La.R.S. 32:1(59) and 48:1(20), the roadway is that portion of the highway that is improved, designed, or ordinarily used for vehicular traffic, exclusive of the berm or shoulder. The roadway also is called the traveled portion of the highway. Pursuant to La.R.S. 32:1(65) and 48:1(21), the shoulder is that portion of the highway which is contiguous with the roadway and is for (1) accommodation of stopped vehicles, (2) emergency use and (3) lateral support of the highway's base and surface. Kyle v. City of Bogalusa, 506 So.2d 719 (La.App. 1st Cir.1987).
Pursuant to the authority of La.R.S. 32:2, 32:144(B) and 48:342, DOTD has the authority to restrict parking on highways and post them with "no parking" signs. Kyle, 506 So.2d at 726. There is no evidence in the record that the place where *586 Mr. Felter parked his vehicle was designated as a no parking area by DOTD and was posted as such. There is no evidence in the record to show that parking was prohibited by La.R.S. 32:143.[3]
The Louisiana Highway Regulatory Act, La.R.S. 32:1 et seq., explicitly proscribes parking vehicles on the roadway (main traveled part) of a highway in La. R.S. 32:141. If a police officer finds a vehicle illegally parked on the roadway of a highway in violation of La.R.S. 32:141, he can move the vehicle, or cause it to be moved, "to a position off the paved or main traveled part of the highway." La.R.S. 32:142(A). A violation of La.R.S. 32:141 can constitute actionable fault. Pierre v. Allstate Insurance Company, 257 La. 471, 242 So.2d 821 (1971).
The Louisiana Highway Regulatory Act treats parking on the shoulder of the highway differently from parking on the roadway of the highway. La.R.S. 32:296 provides as follows:
A. No person shall stop, park, or leave standing any unattended vehicle on any state highway shoulder when such stopping or parking on the highway shoulder shall obstruct the flow of traffic or is a hazard to public safety, unless such stopping, parking, or standing is made necessary by an emergency, except:
(1) In those areas designated as parking areas by the Department of Transportation and Development, or
(2) By any public utility personnel or public utility equipment engaged in the operation of the utility business, public vehicles owned by public bodies which are engaged in the conduct of official business, or privately-owned vehicles which are engaged in services authorized by the local governing authority.
B. In case of an emergency, the driver of such vehicle must operate it in accordance with the normal standards of prudent conduct to protect himself and others from harm.
The clear and unambiguous language of La.R.S. 32:296 proscribes parking "any unattended vehicle on any state highway shoulder when such ... parking on the highway shoulder" (1) "shall obstruct the flow of traffic" or (2) "is a hazard to public safety ...". The trial judge found as fact that the Felter vehicle did not obstruct the flow of traffic and was not a hazard to public safety. After a thorough review and evaluation of the record and the reasons assigned by the trial judge, we conclude that these factual findings are not clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). Based on these factual findings, the trial judge was correct as a matter of law when he held that the Felter *587 vehicle was legally parked.[4] Parking on the shoulder of a highway under ordinary (legal) circumstances does not constitute fault. Ginlee v. Helg, 251 La. 261, 203 So.2d 714 (1967); Brandt v. Rayford, 552 So.2d 1013 (La.App. 1st Cir.1989), writ denied, 556 So.2d 1265 (La.1990); Watts v. McCullom, 64 So.2d 496 (La.App. 1st Cir. 1953).
Pursuant to the authority of La. R.S. 32:5, the City's police officers have the authority to enforce the provisions of the Louisiana Highway Regulatory Act and the regulations of DOTD within their territorial jurisdictions. Conversely, the City's police officers have no duty (or authority) to act when no law or regulation has been violated. The instant case is factually analogous to Johnson v. Larson, 441 So.2d 5, 9 (La.App. 3rd Cir.1983), writ denied, 444 So.2d 124 (La.1984) wherein the court observed as follows:
The two well-lighted vehicles parked upon the shoulder, completely clear of the travel lanes of the highway, created no obvious, dangerous condition for anyone using the highway in a reasonable manner. The deputies could not be expected to anticipate that a driver of a vehicle, under the circumstances presented, would leave the main travel portion of the highway and strike a vehicle parked on the shoulder of the highway. To hold otherwise would place an unreasonable burden upon our law enforcement officers and agencies.
We conclude that the deputies, under the facts presented, did not have a legal duty to protect the parked vehicles against the unforeseeable traffic development that occurred in this case.
These assignments of error are without merit.

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. The plaintiff is cast for the cost of this appeal.
AFFIRMED.

APPENDIX

Patricia Suhr, Individually and as Natural Tutrix of Her Minor, James Wesley Suhr

Versus

Curtis A. Felter, et al.

No. 304,242 Division "L"

19th Judicial District Court

Parish of East Baton Rouge

State of Louisiana

May 1, 1989

WRITTEN REASONS FOR JUDGMENT
This is a tragic wrongful death case which resulted in the death of Norman Suhr, the husband of the plaintiff in this matter. The facts of this case will show that Curtis Felter was in the city of Baton Rouge on July 19, 1985 to visit a sick relative at the Baton Rouge General Hospital. He was driving a 1976 Oldsmobile and was traveling on Interstate 10 when his car began to have mechanical problems. The car had these mechanical problems before and Mr. Felter was aware of them. In fact, the car had broken down once before. As the car continued to have mechanical problems, the engine finally died and the car came to a complete stop. Mr. Felter was in rush hour traffic as these events occurred at approximately 4:30 p.m. Shortly after Mr. Felter's car stopped, a police officer appeared on the scene and advised *588 him that he would assist him in getting out of traffic. The police officer pushed Mr. Felter's car to the shoulder of Interstate 10. The police officer inquired whether or not Mr. Felter could remove the car and Mr. Felter assured him that he would take steps to begin the removal of the car as soon as possible. However, he advised the officer that he was from Morgan City and the officer was apparently aware that if no help was available to him in Baton Rouge he would have to return to Morgan City for help. Mr. Felter further testified that the officer told him he would not call a wrecker since he had been assured that Mr. Felter would take reasonable steps to remove the car and told him to lock and brake his car and turn on the flashers. The police officer who assisted the Felters from traffic took them back to the Baton Rouge General Hospital and waited while they made a phone call and also gave them $5.00 to purchase food. The police officer was apparently aware that the Felters did not have much money on them at the time.
There was considerable testimony at this point in time presented by the plaintiff in an attempt to identify the police officer in question. Suffice it to say that Mr. Felter, who had a 4th grade education, was never able to make a positive identification of the name of the officer. However, the Court considers all the testimony given by Mr. Felter and on balance concludes that the plaintiff has shown by a preponderance of the evidence, from the identifications of photographs and other testimony given by him, that the police in question was more probable than not, an employee of the Baton Rouge City Police Department.
Mr. Felter returned to Morgan City in the early morning hours of Saturday, July 20 and had to wait until he had assistance and transportation back to Baton Rouge before he could come to retrieve his automobile. He also had to wait for a parts store to open before he could secure the necessary part to repair his car. Apparently he knew what was wrong with his car, even prior to its breakdown. Mr. Felter arrived back in Baton Rouge with his son-in-law to retrieve his automobile some time in mid afternoon on the 20th only to find that his car had been involved in the tragic automobile accident about noon of that day. His car was removed from the scene by a wrecker and Mr. Felter went to the Baton Rouge Police Department where he spoke with a city police officer and gave him information concerning the circumstances of how his car came to be on the shoulder that day.
Unfortunately, this is a death claim, and we do not know from the driver of the vehicle, his version of how his automobile left the main travel portion of Interstate and collided with the vehicle parked on the shoulder; however, we do have testimony from two witnesses who saw Mr. Norman Suhr's car strike the parked Felter vehicle. Donald Kaufmann testified that he, his father and Murray Horowitz were on their way to lunch about noon on July 20, 1985 and that they were traveling in the right hand lane about 45 miles per hour. At this particular section of the Interstate, it is three lanes in both east and west directions. There is a slight downgrade of one percent for people traveling east as was later testified by the plaintiff's expert, Dr. Olin Dart. Mr. Kaufmann testified that immediately prior to this time, there had been a heavy downpour and there was quite a bit of water still standing on the highway. He noticed Mr. Suhr's vehicle make a change of lanes maneuver and began to "fish tail out of control". He said the car made a 180 degree spin in front of him and hit the left and left rear of a parked vehicle. Mr. Kaufmann stated that the Suhr vehicle was not exceeding the speed limit in his opinion, but that Suhr's vehicle was going faster than the vehicle in which he was traveling, which was a speed of 45 miles per hour. Mr. Kaufmann stated that they exited his car shortly after as they witnessed the accident. He ran over to the vehicle and was aware that Mr. Suhr had sustained a mortal injury and said that he had made his last gasp of breath at the moment he arrived at the automobile. He noted, as was standing on the side of the highway on the shoulder, that the water running off the Interstate from the previous *589 rainfall was so heavy that it was running over his shoes.
Murray Horowitz gave a version similar to Mr. Kaufmann's, but stated that there was a "light steady rain" at the time the Suhr vehicle made its lane change and spun out of control. He also said that the Suhr was traveling faster than they were. It is important to note that the witnesses were traveling 45 miles per hour under the conditions of the weather and thus raises the question of whether or not the posted speed limit, the prima facie speed law, was the proper standard of care at the time. The Court is of the opinion that because of the heavy rain and the condition of the surface of the roadway, that the prima facie speed law, La.R.S. 32:64, was the one applicable to the parties under the circumstances. It is clear from the testimony from these two witnesses that Mr. Suhr executed a lane change under hazardous road and weather conditions and lost control of his vehicle spinning 180 degrees and striking a parked vehicle. Although we are unable to hear from Mr. Suhr on this issue, this circumstantial evidence is overwhelming that Mr. Suhr was negligent in failing to control his vehicle under the circumstances.
It was later testified to by Dr. Dart that this particular location is one of the most heavily traveled highways in the city of Baton Rouge. It is six lanes wide, and is constantly full of high speed traffic. According to the record, approximately forty thousand vehicles pass this particular location in a twenty-four hour period. Since almost twenty four hours elapsed (from 4:30 Friday until noon Saturdaya period of approximately twenty hours) it can safely be assumed that approximately thirty thousand vehicles had passed the parked Felter vehicle without incident or hazard.
The evidence from the emergency medical personnel and the investigating police officers indicate that Mr. Suhr died almost immediately upon impact in this accident. The testimony of Dr. Dart and the photographs show conclusively that unfortunately for Mr. Suhr, his car, which was much lighter than the parked Oldsmobile, and traveling at approximately 50 to 55 miles per hour, struck the left rear corner of the parked vehicle exactly at a point of the driver's position of the Suhr vehicle. The damage shown by the photographs, in particular photograph 18-E, indicates why Mr. Suhr was killed in this accident. Photographs 18-E and another unmarked, unnumbered photograph in the stack introduced into evidence showing the driver's seat of the Suhr vehicle indicate a extremely high degree of damage at the driver's position. The testimony of Dr. Dart and the photographs indicate that had the Suhr vehicle struck anywhere else than where it did, it probably would have been a glancing blow that may not have been fatal to Mr. Suhr. However, in all probability he would have suffered serious injuries. It is of no use to speculate whether or not Mr. Suhr would have died or whether he would have struck the vehicle had it been parked in a different location.
It is clear from the rest of the testimony in the case that Mr. Suhr was a fine person who did a great deal of work with the Red Cross and other volunteer organizations and that he was a good father and husband. His loss was a clear tragedy to his family both emotionally and economically. Dr. Randolph Rice, the expert economist, testified in lost past and future wages and support, there was an amount of $549,298. In addition to this economic loss, Mrs. Suhr lost her health insurance coverage. In addition to that both Mrs. Suhr and her child lost the companionship, society, love and affection of a caring husband and father.
This Court must decide the comparative negligence of all the parties involved in this case, Mr. Suhr, Mr. Felter and the city police officer. In addition, this Court must decide the question of causation, both cause in fact and legal cause.
It is the plaintiff's contention that the city police officer was negligent in that he had control of the Felter vehicle when he pushed it to the shoulder and left it at the particular spot where the accident happened. With the great advantage of hindsight the expert in this case, Dr. Dart, *590 testified that had the vehicle been pushed further down the highway, the accident would not have occurred and that it would have been placed in a safer location. The Court agrees had the car not been in the spot it was located in at the time of the accident, this tragedy would not have occurred. No expert testimony was needed to convince the Court of that self evident fact. The Court is also convinced that a selection of parking places further down the Interstate would have been a safer location. There is an entrance ramp for vehicles entering the Interstate from Acadian Thruway and the exit for College Drive at this point, which makes an additional fourth east bound lane. The shoulder to the immediate right or south of this entrance lane would have placed the Felter vehicle further away from this normally high speed, high volume traffic on the three regularly traveled east bound lanes of Interstate 10 in this general area.
No statute makes it illegal for the Felter vehicle to have parked on the shoulder of the road. In fact, the shoulders of the interstate highway are designed for exactly what occurred in this case, i.e. emergency stopping. La.R.S. 32:296 states:
"A. No person shall stop, park, or leave standing any unattended vehicle on any state highway shoulder when such stopping or parking on the highway shoulder shall obstruct the flow of traffic or is a hazard to public safety, unless such stopping, parking or standing is made necessary by an emergency, except:....
"B. In the of an emergency, a driver of such vehicle must operate it in accordance with the normal standards of prudent conduct to protect himself and others from harm."
The Court interprets this statute to say that in an emergency situation a driver may stop, park or leave standing an unattended vehicle on a highway shoulder. There is nothing to indicate from the facts of this record and from the photographs that the Felter vehicle was parked in such a way as to constitute a "hazard to public safety" or to "obstruct the flow of traffic". Indeed it has already been pointed out that approximately thirty thousand vehicles had passed between the hours of 4:30 on Friday, July 19 when it became disabled, and 12:00 noon, Saturday, July 20 when it was struck by Mr. Suhr. The police officer in this case not only was courteous and helpful to Mr. Felter under his conditions, but also inquired as to when they would remove the vehicle from the shoulder, according to Mr. Felter's testimony. Mr. Felter, with all deliberate speed, made efforts to remove the car from the shoulder of the road. It is unfortunate that he did not have the resources to stay in Baton Rouge and have the vehicle attended to immediately. He took the only way out available to him from an economic point of view. He was without transportation, so he returned to Morgan City and immediately set about trying to come back to Baton Rouge. Since he had no transportation, he had to wait until transportation was available to him and the parts necessary to repair his car were available to him. Neither the police officer nor Mr. Felter had any way of foreseeing the rain storm and the fact that Mr. Suhr would lose control of his vehicle at the precise point on the Interstate that the shoulder of the road was needed by Mr. Suhr to make an emergency exit from the highway.
Not only do the statutes of this State not impose a duty on the police officer under the particular facts and circumstances of this case, but neither does the jurisprudence. Plaintiff relies heavily on the dissenting opinion in a 4th Circuit case by now Justice Lemmon in the matter of Murray v. Kuhn, 345 So.2d 917 (La.App.1977). That was a five judge opinion in which the plaintiff was in the car parked on the side of the road, not the car which had lost control on U.S. Highway 61. It should be noted that case was decided in 1977 when contributory negligence was a total bar to recovery by a plaintiff. It should be further noted and it is of extreme importance that the plaintiff in that case, Murray, had voluntarily parked his vehicle on the side of the road for purposes of fishing. There was no emergency parking or breakdown *591 as is the case before this Court. But even under the circumstances of a voluntary stopping, the 4th Circuit found zero percent of fault (that is no contributory negligence) on the part of the vehicle parked along the side of U.S. 61 and allowed full recovery for personal injuries and property damages to the plaintiff in that case. The defendant in that case, Mr. Kuhn, as here with Mr. Suhr, lost control of his vehicle as it was traveling down the highway and struck a parked vehicle. Then Judge Lemmon's dissenting opinion discussing the selection of parking places by the plaintiff is of no aid to the plaintiff in the case at bar because that was a voluntarily parking in a non emergency situation. In the facts before this case, a police officer pushed a vehicle in heavy rush hour traffic to the most immediately available parking area. The vehicle was disabled.
The only case to consider a disabled vehicle parked along the side of the road which involved knowledge of police officers is the case of Johnson v. Larson, 441 So.2d 5 (La.App. 3rd Cir.1983). In that case two vehicles were parked on the side of the highway at night, one vehicle giving assistance to another vehicle with a dead or dying battery. Police officers from two different sheriffs' offices came along during the incident and offered assistance to the drivers. The drivers advised the officers that they could handle the problem and the policemen proceeded to on their way. Subsequently a car traveling on the main portion of the highway lost control and struck the rear of one of the vehicles parked on the side of the highway injuring one of the persons in between the vehicles. There, as here, the plaintiff urged that the negligence of the "Deputies Hinson and Berry in failing to take precautionary steps which could have preverted the accident" was the basis of the plaintiff's claim. Id. at 6. At pages 7, 8 and 9 of that opinion by Judge Cutrer, the court discusses and distinguishes three other cases in that Circuit where there existed obvious and dangerous traffic conditions which were known to the respective officers in the cases and that the officers in those cases had ample opportunity to protect from the dangerous condition, but failed to do so. It is important to note that the Court distinguishes these three cases from the facts in Johnson by pointing out that the dangers were "obvious". Justice Cutrer concludes by saying:
"This brings us to the crucial question in the case sub judice; i.e., were these factors present in this case? As we examine the essential facts we conclude that the factors which created liability of the officers in Curry [v. Iberville Parish Sheriff's Office, 405 So.2d 1387 (La.App. 1st Cir.1981)], Duvernay [v. State Through Dept. of Public Safety, 433 So.2d 254 (La.App. 1st Cir.1983)] and LeJeune [v. Allstate Ins. Co., 365 So.2d 471 (La.1978)] are not present in this case.
"In brief, plaintiff acknowledges that he was unable to find any jurisprudence creating a duty under the peculiar circumstances of the present case; we, also, cannot find any such supporting case law.
"On the night of the accident in question, the weather was clear and dry. The highway, at that area, was straight and slightly rolling; there were no obstructions to vision on the highway. When the deputies approached the two parked vehicles, each was parked on the shoulder of the road, completely clear of the travel lanes. Both cars' lights were burning and Rhodes had turned on her emergency lights....
"The two well-lighted vehicles parked upon the shoulder, completely clear of the travel lanes of the highway, created no obvious, dangerous condition for anyone using the highway in a reasonable manner. The deputies could not be expected to anticipate that a driver of a vehicle, under the circumstances presented, would leave the main travel portion of the highway and strike a vehicle parked on the shoulder of the highway. To hold otherwise would place an unreasonable burden upon our law enforcement officers and agencies.
"We conclude that the deputies, under the facts presented, did not have a legal duty to protect the parked vehicles *592 against the unforeseeable traffic development that occurred in this case." Id. at 9.
It should also be noted that the plaintiff in Johnson was in the parked vehicle and the defendant was the driver of the vehicle on the main travel portion who lost control. Just the opposite of the facts in this case and much like the facts in Murray v. Kuhn. Just as those deputies could not foresee the unusual circumstances of that accident, this Court finds that the city police officer who parked the vehicle (in effect) did not create and obvious and dangerous condition for anyone using the highway in a reasonable manner. The fact that thousands of cars were successful in passing the parked Felter vehicle lends support to that conclusion. The fact that it would rain and a vehicle would lose control at the precise point where the Suhr vehicle would ultimately strike the parked vehicle was completely unforeseeable to either Mr. Felter or the police officer.
The question of foreseeability looms quite large also with regard to the issue of legal cause. In a recent opinion, Pitre v. Opelousas General Hospital, 530 So.2d 1151 (La.1988), the Supreme Court, in an excellent opinion by Justice Dennis, had occasion to give a thorough discussion of the entire issue of cause in fact and legal cause. The Pitre case is in the setting of a medical malpractice claim. Justice Dennis discusses the issues of legal cause as commented on by our courts in both the civil law and under common law. On page 1159, Justice Dennis quotes from P. Catala and J. Weir, Delict and Torts: A Study in Parallel, Part IV, Causation, 39 Tu.L.Rev. 701 (1965) wherein he says "In practice, adequate cause has been defined as `the fact or event which is normally calculated to produce harm of a kind in question, in a given situation, as distinct from the cause which produces harm only by reason of extraordinary circumstances'". In discussing the test under common law at page 1160, Justice Dennis says "The test ..., is foreseeability in the sense of hindsight, not foresight; it is what a court, reviewing an event later, considers to have been foreseeable in order to do justice in the case before it". After examining all the factors under Louisiana law with an analysis to articles under the Civil Code and the Obligations article, Justice Dennis comes up with a rule for legal cause under our Louisiana civilian tradition. He sets out the rule with these words:
"After considering the foregoing rules and policy considerations, we conclude that as a general principle that the same criterion of foreseeability and risk of harm which determined whether a physician in this kind of situation was negligent in the first instance should determine the extent of his liability for that negligence; and that the doctor should not be held liable for consequences which no reasonable practitioner would expect to follow from his conduct....
"We reject as a general rule the test of foreseeability in the sense of hindsight, not foresight, as being inappropriate when the doctor has been guilty only of ordinary negligence in this kind of medical malpractice case". Id. at 1161.
Justice Dennis found that the doctor was guilty of a violation of a duty and was negligent to the plaintiffs in some respects, but as to the unforeseeable birth defect of albinism, Justice Dennis in a matter before him on an exception of no cause of action, found that there was no legal causation as to that element of the plaintiff's case. He rejected the minority opinion of the common law states of judging foreseeability with the benefit of hindsight. Just as the practitioner would not be liable for the consequences which no reasonable practitioner would expect to follow from his conduct, so we should not expect a police officer to be liable for his conduct which no reasonable police officer would expect to follow from his conduct. We cannot view the decision from this unknown, unnamed officer to leave the vehicle parked in the precise spot where he left it parked with the benefit of hindsight. There is no way that officer could have known that precise parking spot would be the place where a car would lose control and exit the main travel portion of the highway. The officer *593 was confronted with an emergency condition, namely a car stalled in rush hour traffic. There is no way the officer could have predicted the weather conditions which contributed to Mr. Suhr's loss of control. Even the plaintiff's own expert opined "hydroplaning" probably contributed to Mr. Suhr's loss of control of his vehicle. Mr. Kaufmann, who witnessed the accident, but is not an expert also was of the opinion that the Suhr vehicle was hydroplaning when it was out of control and spinning around in front of him.
In order to rule in favor of the plaintiff in this case, this Court would have to ignore not only the statute in question, but the jurisprudence of this state in finding a duty on the part of the officer. It would further have to ignore the analysis of Justice Dennis in the Pitre case in order to find that a breach of a duty was the legal cause of the damages in this case. This Court is not prepared to overrule the appellate courts and the Supreme Court of this state, or the clear legislative expression in the statute. It is impossible not to be swayed by great sympathy for the plaintiff, Mrs. Suhr, in this tragic loss of her husband; however, the Court cannot allow sympathy to overrule the clear dictates of law. Since the Court has found from the very unusual facts of this case, that no legal duty existed on the part of the Baton Rouge City Police officer and has further found that his actions in this case were both reasonable and that the accident was unforeseeable and thus no legal duty on his part, the Court must therefore dismiss her claim and render judgment in favor of the defendants. Judgment will therefore be rendered in accordance with the foregoing reasons and counsel for the defendant is to prepare the judgment.
Baton Rouge, Louisiana, this 15 day of February, 1989.
 /s/ Douglas M. Gonzales
 DOUGLAS M. GONZALES, Judge
 Division "L"
NOTES
[1] Plaintiff amended her petition to add State Farm Insurance Company (State Farm) as the uninsured motorist insurer of the Suhr vehicle. Prior to trial, Felter, Allstate, State Farm and the State were dismissed as parties defendants.
[2] The detailed facts of this case are set forth in the trial judge's reasons for judgment. We adopt these factual statements as our own and attach a copy of those reasons hereto.
[3] La.R.S. 32:143 provides as follows:

A. No person shall stand, or park a vehicle, except when necessary to avoid conflict with other traffic, or in compliance with law or the directions of a police officer or traffic control device, in any of the following places:
(1) On a sidewalk;
(2) In front of a public or private driveway;
(3) Within an intersection;
(4) Within fifteen feet of a fire hydrant;
(5) On a cross walk;
(6) Within twenty feet of a cross walk at an intersection;
(7) Within twenty feet upon the approach to any flashing beacon stop sign, or traffic control signal located at the side of a roadway;
(8) Between a safety zone and the adjacent curb, or within twenty feet of points on the curb immediately opposite the ends of a safety zone;
(9) Within fifty feet of the nearest rail of a railroad crossing;
(10) Within twenty feet of the driveway entrance to any fire station, and on the side of a street opposite the entrance to any fire station within seventy-five feet of said entrance, when properly posted;
(11) Alongside or opposite any street excavation or obstruction when stopping, standing, or parking would obstruct traffic;
(12) On the roadway side of any vehicle stopped or parked at the edge or curb of a street;
(13) Upon any bridge or other elevated structure upon a highway or within a highway tunnel;
(14) At any place where official signs prohibit such;
(15) Any place where parking will obscure or obstruct visibility of any traffic control device.
B. No person shall move a vehicle not lawfully under his control into any such prohibited area or away from a curb such a distance as is unlawful.
[4] Further, R.S. 32:474 provides "[T]he department or any municipality or any parochial authority may take into custody any motor vehicle found abandoned on public or private property...." (Emphasis added). La.R.S. 32:471(1) reads as follows:

"Abandoned motor vehicle" means a motor vehicle that is inoperable and is left unattended on public property for more than five days, or a motor vehicle that has remained illegally on public property for a period of more than five days, or a motor vehicle that has remained on private property without the consent of the owner or person in control of the property for more than five days.
The Felter car was not "abandoned" because it had not been left unattended for more than five days; thus, the police department could not tow it away as an "abandoned motor vehicle".