Judgment rendered June 30, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,958-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

TARA JEFFERSON ROBINSON
AND NORRENCE ROBINSON,
INDIVIDUALLY AND ON BEHALF
OF THEIR MINOR CHILD, S.R.              Appellants

versus

DARYL MITCHELL, ET AL.                 Appellees

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 603,276

Honorable Craig Owen Marcotte, Judge

* * * * *

LAW OFFICE OF SUSAN E. HAMM          Counsel for Appellants
By: Susan E. Hamm

JEFFREY M. LANDRY                    Counsel for Appellee,
Louisiana Attorney General           State of Louisiana

DAVID H. NELSON
Assistant Attorney General

McNEW, KING & LANDRY, LLP            Counsel for Appellee,
By: Brady D. King, II                Louisiana Patient's
                                     Compensation Fund

* * * * *

Before COX, STEPHENS, and ROBINSON, JJ.

**COX, J.**

This case arises out of the First JDC, Caddo Parish, Louisiana. Tara and Norrence Robinson filed suit individually and on behalf of their minor child, S.R. (collectively referred to as "the Robinsons"), against Dr. Daryl Mitchell ("Dr. Mitchell"), Louisiana Medical Mutual Insurance Company ("LAMMICO"), Willis Knighton South Health Center ("WKS"), Willis Knighton Health Systems ("WKHS"), Willis Knighton Health Systems Laboratories ("WKHSL"), Dr. Daryl Mitchell and Dr. Cynthia Montgomery, AMPC d/b/a Mitchell & Montgomery M.D.s ("Dr. Mitchell's office"), and Jeff Landry, Attorney General of the State of Louisiana (hereinafter collectively referred to as "Defendants"). The Louisiana Patient's Compensation Fund ("LPCF") and the Louisiana Patient Compensation Fund Oversight Board ("LPCFOB") were later added as defendants. In addition to other claims not at issue in this appeal, the Robinsons filed a wrongful life claim on S.R.'s behalf. The LPCF filed a partial exception of no cause of action and dismissal of the wrongful life claim. The trial court granted the partial exception of no cause of action and dismissed with prejudice the wrongful life claim. The Robinsons now appeal that judgment.

**FACTS**

Dr. Mitchell confirmed Mrs. Robinson's pregnancy through an ultrasound on February 25, 2014. On April 17, 2014, Dr. Mitchell ordered a Quad Screen Test, which is a blood test to determine whether an unborn child is at risk for certain genetic conditions. Among other genetic markers, the test screens for Down syndrome, which occurs when there is an extra copy of the chromosome 21 in a person's DNA. Mrs. Robinson's blood

sample was collected by WKHSL and sent to Mayo Medical Laboratories ("Mayo"), where the Quad Screen was performed. Mayo sent the test results to WKHSL via computer. The results, which showed a positive result for Down syndrome, were received by WKHSL on April 21, 2014.

WKHSL then forwarded the results via facsimile to Dr. Mitchell's office, which Dr. Mitchell designated as the preferred method of delivery. The Quad Screen results were retrieved by Sharon Trent, LPN and employee of Dr. Mitchell's office. Nurse Trent recorded the test results on Mrs. Robinson's medical chart as "negative," or not at risk for Down syndrome. The Quad Screen results were then placed in Mrs. Robinson's chart for review by Dr. Mitchell. Dr. Mitchell initialed the test results and informed the Robinsons that the results were normal on her next office visit. Subsequent ultrasounds were performed by Dr. Mitchell's office, none of which revealed abnormalities.[1]

Dr. Cynthia Montgomery delivered S.R. via Cesarean section on September 28, 2014. At birth, S.R. was noted to have features suggestive of Down syndrome. S.R. was admitted to the NICU, and an examination showed that S.R. had multiple features consistent with Down syndrome. A blood sample was collected from S.R., a chromosome analysis was performed, and the results were consistent with Down syndrome. Dr. Mitchell reviewed Mrs. Robinson's file and told the Robinsons that he previously read the Quad Screen results incorrectly. At this point, the Robinsons were informed of the Down syndrome diagnosis.

---

[1] This recount of the medical events is derived from the MRP opinion.

The Robinsons first presented their claim to a medical review panel ("MRP"). The MRP found that the evidence did not support a finding that WKHS, WKHSL, or WKS failed to meet the applicable standard of care. It found that the evidence supported a finding that Dr. Mitchell and his office failed to meet the applicable standard of care. However, due to conflicting evidence, the members of the panel were unable to determine whether this conduct was a factor of the resultant damages alleged by the Robinsons.

The MRP stated that LPN Trent misread the lab results on April 22, 2014, and failed to advise Dr. Mitchell that the Down syndrome result was positive. Although Dr. Mitchell initialed the report, he failed to note that the result was positive. The MRP found that both LPN Trent and Dr. Mitchell failed to meet the applicable standard of care, and noted that it is the physician's responsibility to review the test results.

As to damages, the MRP opinion stated that when Dr. Mitchell informed the Robinsons of the Down syndrome diagnosis, "they told him that they would not have really changed anything and that they would still love their child." The MRP noted that the parents stated in their submission to the panel that had they known the lab result was positive for Down syndrome, they would have terminated the pregnancy. This conflicting evidence prevented the MRP from determining whether the complained of conduct was a factor of the resultant damages, which the parents contend is the birth of a child with Down syndrome.

The Robinsons filed their petition for damages against Defendants in district court on September 1, 2017. The Robinsons alleged that WKS, WKHS, WKHSL, and Dr. Mitchell's office are vicariously liable for the

medical negligence committed by their employees in the course and scope of their employment. LAMMICO is the insurer for Dr. Mitchell's office.

In their petition, the Robinsons stated, "Given the extraordinary suffering experienced by S.R. as a result of being born with Down syndrome, never being born is and always will be preferred to being born with Down syndrome." They stated that had they known the Quad Screen revealed a risk of giving birth to a child with Down syndrome, they would have terminated the pregnancy. They alleged the following damages:

1)  Past, present and future loss of love, affection, society, nurturing, guidance, and companionship suffered by [the Robinsons];
2)  Past, present and future mental and emotional anguish suffered by [the Robinsons];
3)  Past, present and future pain and suffering;
4)  Past, present and future extraordinary medical and counseling expenses and related benefits of S.R., including but not limited to custodial care of S.R.;
5)  Loss of enjoyment of life;
6)  Lost wages and support and/or loss of potential income;
7)  Lost income;
8)  Loss of earning capacity;
9)  Wrongful life;
10) Extraordinary financial loss and/or expenses as a result of the negligence of defendants;
11) Past, present and future medical care and treatment and related benefits of S.R.;
12) Past, present and future custodial care of S.R.

They stated the following in their petition regarding S.R.:

The infant, S.R., is and always will be physically, developmentally, mentally, intellectually and emotionally delayed as expected of and consistent with a person with Down syndrome. This condition is a chromosomal abnormality and is permanent. S.R. will live her whole life with physical, developmental, mental, intellectual and emotional delays and abnormalities requiring extraordinary medical care and treatment that a normal healthy baby, child and/or adult would not experience. Consequently, S.R. has and will continue to have extraordinary challenges, responsibilities, and financial burdens as well as extraordinary mental and emotional trauma for the rest of her life. The responsibilities and financial

4

burdens will likely continue even after the death of the parents and caretakers of S.R., Tara Robinson and Norrence Robinson, as people with Down syndrome now live into their 60s and even 70s with appropriate medical and psychological care and treatment.

The Robinsons listed 13 issues and/or conditions that S.R. could potentially face, and of those 13 conditions, S.R. currently shows signs of or is treated for hypotonia and ligament laxity, gastrointestinal issues, Celiac disease, pulmonary issues, low thyroid, and emotional issues.

The Robinsons stated that the doctrine of *res ipsa loquitur* applies because the events in this case could not reasonably have occurred absent the negligence of Defendants. They argued that the Medical Malpractice Act and the Liability for State Services Act, including the cap on recovery, are unconstitutional in that they violate Art. 1, Sec. 2- Due Process; Art. 1, Sec. 3- Equal Protection; Art. 1 Sec. 4- Right to Property; and, Art. 1, Sec. 22- Access to Courts. The Robinsons also requested a jury trial.

The State, through the Louisiana Attorney General, intervened in the suit and requested the trial on the merits be bifurcated from the trial on the constitutional issues raised. The trial court bifurcated the case and stated the trial on the constitutional issues would not be scheduled until a ruling on the merits is entered.

WKHS, WKS, and WKHSL filed their answer on October 27, 2017. They denied that they, or anyone for whom they are responsible, are guilty of any fault, negligence, or breach of a medical standard of care. They highlighted that the MRP unanimously found that they did not fail to meet the appropriate standard of care.

5

Dr. Mitchell, his office, and LAMMICO answered the Robinsons' petition on November 8, 2017. They also denied the allegations and liability. They stated that this case falls under the Louisiana Medical Malpractice Act ("MMA") and in the alternative, pled an act of God.

The Robinsons amended their petition on April 24, 2018, and added the following damages:

13) Wrongful Birth;
14) Ordinary and usual financial burden, loss and/or expenses of raising a child.

WKHS, WKS, and WKHSL, answered the amended petition and filed a motion for summary judgment ("MSJ"). They asserted that "there is no genuine issue of material fact that there was no deviation from the standard of care on their part in the treatment provided to [Mrs. Robinson], the alleged conduct of these defendants did not cause additional injury, the plaintiffs do not have any expert witness to satisfy their burden of proving a deviation from the standard of care on the part of these defendants caused additional injury that would not otherwise have occurred[.]" They stated that the Robinsons have not responded to interrogatories and have not revealed any expert witness to support a deviation from the standard of care.

The Robinsons stated they did not intend to produce any expert testimony regarding the standard of care applicable to WKHS, WKS, and WKHSL. The Robinsons did not oppose the dismissal of these defendants from the suit. The trial court granted the MSJ on behalf of WKHS, WKS, and WKHSL, and dismissed them from the suit with prejudice.

The Robinsons filed a petition for authorization to settle medical malpractice claim with reservation of rights on June 11, 2019. The

settlement was between the Robinsons and Dr. Mitchell and his office. The Robinsons agreed to $2,500 from Dr. Mitchell and $100,000 from his office, in addition to an agreement to keep these two defendants listed in name only for the purposes of requesting additional damages against the LPCF and the LPCFOB. The Robinsons stated that they received the money, but it was not enough to cover damages. They agreed to release Dr. Mitchell and his office from any other claims or damages arising in this suit. The only remaining defendants are the LPCF and LPCFOB.[2]

The LPCF responded to the settlement petition and asserted its right to a $100,000 credit against any future judgment in the matter by virtue of the settlement. It reserved the right to assert the affirmative defenses of waiver, estoppel, set off, and/or failure to mitigate damages and reserved the right to contest that the claims asserted are covered by the MMA.

The LPCF did not agree with the proposed settlement judgment. It argued that although the $100,000 settlement does establish the liability of the settling healthcare provider, the Robinsons still have the burden of proving that the admitted medical malpractice caused damages in excess of $100,000. Their second argument concerned whether the Robinsons have a cause or right of action to prosecute a wrongful birth or wrongful life claim. The trial court signed a judgment concerning the settlement, but reserved to the LPCF the right to contest causation and damages, as well as whether the Robinsons may assert a cause of action for wrongful birth or wrongful life.

The LPCF filed a partial exception of no cause of action and dismissal of the wrongful life claim. It stated that the Robinsons have brought a

_____

[2] The State of Louisiana remains a party on the constitutional issues.

wrongful birth claim on their own behalf and a wrongful life claim on behalf of S.R. In this exception, the LPCF is only arguing the wrongful life claim should be dismissed at this time. It highlighted that the petition for approval of settlement stated that S.R.'s chromosomal condition and alleged physical and mental disabilities were not caused by the healthcare providers. It stated that the petition does not allege acts or omissions which either caused the Down syndrome or allowed the pregnancy of S.R.

The LPCF detailed the difference between wrongful birth (a claim brought by the parents claiming they would have avoided conception or terminated the pregnancy if they had been informed of the risk of birth defects), wrongful life (claim brought on behalf of the child and seeks to recover damages for having to endure life in an afflicted condition), and wrongful pregnancy/conception (claim brought by the parents of a healthy child alleging the negligent performance of a sterilization procedure and seeks to recover damages resulting from the unintended conception and birth). It argued that *Pitre v. Opelousas General Hospital*, 530 So. 2d 1151 (La. 9/12/1988), and subsequent cases on the issue of wrongful life have held that wrongful life is not an action in Louisiana.

It cited *Davis v. Board of Supervisors of La. State Univ. & Agr. & Mech. Coll.*, 97-0382 (La. App. 4 Cir. 3/18/1998), 709 So. 2d 1030, as stating that the healthcare providers did not act or fail to act in any way that contributed to the child's genetic condition, which is the same issue in the case at hand. The Fourth Circuit stated, "We are troubled by the philosophical conundrum flowing from [the claimant's] suggestion that

8

somehow she would have been advantaged had she not been born. This begs the question of how a person who never existed is advantaged[.]"

The LPCF argued that although the claim is brought by the Robinsons, it is S.R.'s claim. Essentially, her options were life with Down syndrome "or death by abortion." It questioned whether under our law, there is an option for S.R. in the first place and notes that Louisiana law prohibits anyone from assisting someone in a suicide. Finally, it stated, "As a Wrongful Life claim is based solely upon the legal fiction that an unborn child would have chosen being aborted rather than life with an afflicted condition, a Wrongful Life claim, if recognized in Louisiana, would have to completely ignore the widely recognized presumption that all human beings have an innate and compelling instinct for self-preservation and be based solely upon rank speculations, i.e. what option would the unborn child choose?"

The Robinsons opposed the exception of no cause of action, arguing that Louisiana law does recognize the need for compensation for damages suffered by a child resulting from birth. They argued that the *Pitre* case is distinguishable because *Pitre* dealt with a case of albinism, which was not reasonably foreseeable, and their case deals with Down syndrome, which is reasonably foreseeable via testing. They also pointed out that the *Davis* court declined to address whether or not Louisiana recognizes an action for wrongful life and the LPCF's quotes from *Davis* are dicta.

On August 24, 2020, the trial court heard argument regarding the partial exception of no cause of action regarding S.R.'s wrongful life claim. At the hearing, the Robinsons argued that Dr. Mitchell caused S.R. to have

9

to live with Down syndrome and that is no different than causing the Down syndrome. The LPCF argued that Dr. Mitchell did not cause S.R. to have Down syndrome, and Louisiana has never considered "life" to be a damage. The Robinsons countered by stating that the damage is S.R.'s life of pain and suffering from living with Down syndrome. At the hearing, the trial court disagreed with the Robinsons' arguments and granted the no cause of action for wrongful life. On August 28, 2020, the trial court rendered its judgment on the partial exception of no cause of action. It granted the exception of no cause of action regarding S.R.'s wrongful life claim and dismissed that cause of action with full prejudice. The Robinsons now appeal that judgment.

## DISCUSSION

The Robinsons' arguments are all closely connected. In their first two assignments of error, they argue the trial court erred in granting the no cause of action and dismissing S.R.'s claim for wrongful life. The remaining arguments deal with the issues of causation and damages, which are required elements for a tort claim. For this reason, their arguments will be addressed together. The primary question we must address is whether the State of Louisiana acknowledges a claim for wrongful life. The Robinsons argue that jurisprudence has left the door open for a wrongful life claim and that but for the negligence of Defendants, S.R. would not have been born with Down syndrome. The LPCF argues that there is no action for wrongful life in our civil code or statutory provisions and it is the prerogative of the legislature, not the courts, to change that. The LPCF highlights that the

Defendants could not have caused or prevented S.R.'s Down syndrome because it is a genetic condition.

An exception of no cause of action raises a question of law. *Billiot v. Billiot*, 52,391 (La. App. 2 Cir. 11/14/18), 262 So. 3d 401. The standard of review for an appeal of a no cause of action ruling is *de novo*. *Larkin Dev. N., L.L.C. v. City of Shreveport*, 53,374 (La. App. 2 Cir. 3/4/20), 297 So. 3d 980, *writ denied*, 2020-01026 (La. 12/22/20), 307 So. 3d 1039.

A wrongful life action is brought by or on behalf of the child for having to endure life in the afflicted conditions. *Pitre, supra.* It is alleged that the physician's negligent practice or failure to properly advise the parents has led to the birth of a child in the afflicted condition. *Id.*

In *Davis*, the Fourth Circuit stated that because of the facts of that case, it did not need to address whether Louisiana recognizes a wrongful life claim. However, the issue has been squarely presented to us in the case before us. Before determining whether S.R.'s action meets the required elements of a tort claim, we must first determine if wrongful life is a valid claim in Louisiana. The Louisiana legislature has been silent on whether Louisiana will recognize a wrongful life claim. For the reasons outlined below, we do not find this wrongful life claim to be valid in Louisiana.

In *Pitre*, the Louisiana Supreme Court first addressed a wrongful life claim. It found that the doctor did not owe a duty to the unconceived child to protect her from the risk of being born with albinism. Although it seems that the Louisiana Supreme Court left the door open for future wrongful life claims, Louisiana courts have found wrongful life claims to be invalid for various reasons. In *Henry v. Taco-Tio, Inc.*, 614 So. 2d 772 (La. App. 2 Cir.

11

1993), this Court stated, "Louisiana law has never recognized a cause of action for wrongful life which is based solely on illegitimacy." See *Latullas v. State*, 94-2049 (La. App. 1 Cir. 6/23/95), 658 So. 2d 800; *Lloyd v. Howard*, 566 So. 2d 424 (La. App. 3 Cir. 1990); *Doe v. Cronan*, 487 So. 2d 461 (La. App. 5 Cir. 1986). Cerebral palsy was not found to be a reasonably foreseeable defect that would arise from a botched tubal ligation. *Conner v. Stelly*, 2002-549 (La. App. 3 Cir. 10/30/02), 830 So. 2d 1102, *writs denied*, 2003-0129 (La. 3/21/03), 840 So. 2d 540, and 2003-0039 (La. 3/21/03), 840 So. 2d 551. This begs the question of when, if ever, a wrongful life claim could be a valid cause of action in Louisiana.

The Louisiana First Circuit in *Pines v. Dr. Carlos D. Moreno, Inc.*, 569 So. 2d 203 (La. App. 1 Cir. 1990) concluded that each plaintiff had stated a cause of action, of which wrongful life was pled by the plaintiffs, even though they did not specify what cause of action had been stated. Wrongful life was not specifically recognized in this case by the First Circuit. The First Circuit does not recognize partial no causes of action like the Second Circuit does. As such, we are not sure what cause of action survived the no cause of action motion.

We are not bound by the decisions of other courts of appeal. Additionally, we find that *Pines* is distinguishable from the facts of the case before us. The *Pines* case does not indicate that the existence versus non-existence argument was at the core of the claim. Instead, the mother argued that the misdiagnosis and subsequent prescription aggravated an existing condition of the unborn child. The claim label of wrongful life seems to have come from the court of appeal in its analysis. The trial court stated

12

there was no claim under *Pitre*, which covers much more than just wrongful life.

The State of Louisiana historically and presently values the life of the unborn, as indicated by our legislature, which determines which causes of action will be available under our law as they are responsible for passing laws that affect the people of this State. An unborn child shall be considered as a natural person for whatever relates to its interests from the moment of conception. La. C.C. art. 26. Under La. C.C. art. 1474, unborn children have the capacity to receive donations. Under La. C.C. art. 2315.2, both parents and siblings have recovered for the wrongful death of an unborn child. *See In re Air Crash Disaster at New Orleans, La*., 795 F. 2d 1230 (5th Cir. 1986); *Danos v. St. Pierre*, 402 So. 2d 633 (La. 1981). Additionally, an unborn child, conceived at the time of the mother's accident, and subsequently born alive, would have a cause of action for loss of consortium. *Mason v. Luther*, 2005-25 (La. App. 3 Cir. 6/1/05), 903 So. 2d 1145.

Succession law also protects the interest of the unborn. An unborn child conceived at the death of the decedent and thereafter born alive shall be considered to exist at the death of the decedent. La. C.C. art. 940. An unborn child's rights may be preserved after the death of her father by appointment of a curator. La. C.C. art. 252. Allowing a claim on behalf of the child that states the child would be better off having not been born is in opposition to our laws recognizing and protecting the rights of the unborn.

The wrongful life claim is brought by the parents on behalf of the child because the child is too young or does not have the capacity to bring

13

the claim herself. The parents are speaking on behalf of the child; the child is not speaking for herself. Regardless of the outcome, a public record would always exist to remind the child that her parents, and possibly a jury, determined that she would have been better off had she not been born.[3] If this argument was allowed to move forward, the courts would be placed in a position of determining which conditions or disabilities render a life not worth living. People with similar conditions or disabilities would then be grouped with the plaintiff and said to have "wrongful" lives. The courts have no business declaring that among the living there are groups of people who should have never been born.[4]

In the case before us, the Robinsons argue on behalf of their child that it would have been better if she had not been born rather than to be born with Down syndrome. We disagree that this is a legally recognizable argument in Louisiana, regardless of how it is captioned. In addition to the considerations set forth above, this argument sets up a philosophical and theological debate as to whether a child's request for abortion is akin to requesting assistance in suicide. Our jurisprudence recognizes that the first law of nature is that of self-preservation. A person is conclusively presumed to act in such a manner as will not unnecessarily expose himself to physical harm. *Lipscomb v. News Star World Pub. Corp.*, 5 So. 2d 41 (La. App. 2 Cir. 1941); s*ee also Carter v. City Par. Gov't of E. Baton Rouge*, 423 So. 2d 1080 (La. 1982). Additionally, Louisiana criminalizes the assistance of suicide. La. R.S. 14:32.12.

---

[3] Kathleen Gallagher, Comment, *Wrongful Life: Should the Action Be Allowed?*, 47 La. L. Rev. 1319 (1987).
    [4] *Id.*

14

The Robinsons raise the issue of abortion in this case by stating they would have aborted within the time limits allowed by law if they would have known of the defect. The laws of this country, whether agreed upon or not, give the *mother* the right to choose abortion within certain guidelines, *not the unborn child*. Given that an unborn child cannot choose an abortion of herself, it follows that a child cannot sue her doctor, or even parents, for not having been aborted.

Additionally, in their petition, the Robinsons further stated, "Given the extraordinary suffering experienced by S.R. as a result of being born with Down syndrome, never being born is and always will be preferred to being born with Down syndrome." We cannot agree that a life with Down syndrome is not worth living. Down syndrome is the most commonly occurring chromosomal condition. Approximately one in every 700 babies in the U.S. is born with Down syndrome—around 600 births per year.[5] We have made great societal and medical strides in understanding and treating children born with Down syndrome. During the first half of the 20th century, the majority of children with Down syndrome were placed in institutions.[6] The families were convinced, often by members of the medical community, that the child was less than human and their needs would be so great that the families would not be able to raise them.[7] Now, people with Down syndrome are active participants in educational, social, and recreational

---

[5] *Down Syndrome Myths & Truths*, National Down Syndrome Society (last visited June 4, 2021), https://www.ndss.org/wp-content/uploads/2017/08/NDSS-Myths-and-Truths-2015.pdf.

[6] *History of NADS,* National Association for Down Syndrome (last visited June 4, 2021), https://www.nads.org/about-us/history-of-nads.

[7] *Id.*

activities.[8]  They are included in the typical education system, participate in sports, music, art programs, and other activities in their communities. Increasingly, individuals with Down syndrome graduate from high school with diplomas, and participate in postsecondary academic and college programs.[9]  People with Down syndrome are valued members of their families and communities, and make meaningful contributions to society.[10]

We refuse to regress back to the early 20th century way of thinking about children with Down syndrome.  A life with Down syndrome, although difficult, does not equate to a life not worth living.

## CONCLUSION

For the reasons stated above, we affirm the trial court's judgment granting the LPCF's partial exception of no cause of action and dismissal of S.R.'s wrongful life claim.  Costs associated with this appeal are assigned to the Robinsons.

**AFFIRMED.**

---

[8] *Down Syndrome Myths & Truths, supra.*
[9] *Id.*
[10] *Id.*